582

ALDON HOMES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BARCA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60020, 60021. Filed December 29, 1959.

*Sidney H. Wall, Esq., Clyde E. Tritt, Esq.,* and *Warren M. Christopher, Esq.,* for the petitioners.

*Richard W. Janes, Esq.,* and *Leo K. O'Brien, Esq.,* for the respondent.

BRUCE, *Judge:* These proceedings involve the following deficiencies in income tax:

| Docket No. | Taxable period | Petitioner | Deficiency |
|---|---|---|---|
| 60020 | June 1, 1951, to Dec. 31, 1951 | Aldon Homes, Inc _____ | $102,748.90 |
| 60021 | Jan. 1, 1951, to Dec. 26, 1951 | Barca Corporation _____ | 4,582.54 |

The issues relating to Aldon Homes, Inc., are: (1) Is respondent correct in disregarding the existence of Barca Corporation and of 15 other corporate entities, and in imputing the combined net income of these 16 corporations to Aldon Homes, Inc., pursuant to section 22(a),[1] or (2) in the alternative, is respondent correct in attributing the combined net income of Barca Corporation and 15 other corporations to Aldon Homes, Inc., pursuant to section 45; (3) in the event respondent is sustained on either the first or second issue, is he then correct in adjusting the resulting net income of

---

[1] All statutory references are to the Internal Revenue Code of 1939.

Aldon Homes, Inc., by disallowing deductions for bond and note interest and bond premiums paid by the 16 corporations during the taxable period in issue on the ground that these expenditures were distributions of profits and not payments on indebtedness.

The issues relating to Barca Corporation are alternative issues to those relating to Aldon Homes, Inc., and need not be decided in the event the Court holds for respondent on the first or second issue relating to Aldon Homes, Inc. These issues are: (1) Is respondent correct in disallowing the surtax exemption and excess profits credit of Barca Corporation and in apportioning a single surtax exemption and excess profits credit among Barca Corporation and 15 other corporations, pursuant to any or all of the following sections: 15(c), 45, and 129; (2) is respondent correct in disallowing Barca Corporation's deduction of payments of bond interest and premiums on the grounds that said payments were distributions of profits and not payments on indebtedness. Similar deficiencies have been determined against each of the other 15 alphabet corporations, but said deficiencies are not before the Court in the instant case.

### FINDINGS OF FACT.

The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Aldon Homes, Inc., hereinafter referred to as Aldon, and Barca Corporation were California corporations. They filed tax returns for the periods here involved with the collector of internal revenue for the sixth district of California. The returns were made on the basis of cash receipts and disbursements.

Donald Metz, Willard Woodrow, and Albert Leighton associated together in the construction business in 1945 under the name Aldon Construction Company. In about 1947 Aldon Construction began to specialize in tract development of single family residences. Between 1947 and 1950 Aldon Construction profitably developed numerous tracts of land and built several thousand houses. In most of its tracts it utilized an advertising insigne which read, "Aldon Built Seal of Merit," and emphasized in its advertisements that the developments were "Aldon" projects. Aldon Construction and Donald Metz developed fine reputations among the buying public and financial institutions as builders of homes.

The customary method for Aldon Construction to finance the development of a tract of houses was first to interest various individuals in investing in the proposed venture. The individuals would invest sufficient funds to cover the cost of acquiring the land and the miscellaneous preconstruction expenses, such as advances to cover initial engineering and architectural expenses. The funds for

actual construction of the houses were obtained through interim loans from local institutions. Finally, an agreement would be made with a local or eastern financial institution to finance the purchase of the completed houses by the future homeowners. The investors as a group did not participate in the actual development of the tract. Their sole function was to furnish the funds to initiate the development of the tract. In return for their investment they generally participated in one-half of the profits from the enterprise. Aldon Construction did the actual development of the tracts and received the other one-half of the profits. Over its period of operations Aldon Construction became acquainted with a number of investors who would be contacted and given first opportunity to participate in each new project.

Leighton died in mid-1950. On September 21, 1950, Aldon Construction was liquidated, and Metz, Woodrow, and Ira Oberndorfer formed a partnership to continue the operation of Aldon Construction under the same name.

In mid-1950 Metz and his associates became interested in a number of abutting parcels of undeveloped land in Downey, California, and decided to acquire the parcels for the purpose of consolidating them and developing a residential tract. Thus Aldon was incorporated on June 15, 1950, and Aldon Construction's investor group was given the opportunity to invest in the project for a 50 per cent participation in the profits. Aldon's primary purpose, as stated in its articles of incorporation, was "to acquire real property, to execute loans thereon and to have houses constructed thereon for a fee." Aldon's capitalization consisted of 45 shares of no-par common stock issued at $100 per share on July 15, 1950, as follows:

|  | Shares |
|---|---|
| Ira Oberndorfer | 22.5 |
| Donald Metz | 11.25 |
| Willard Woodrow | 11.25 |

A portion of the stock was subsequently redistributed among numerous individuals, Oberndorfer, Metz, and Woodrow retaining a controlling interest.

Aldon's books were opened on June 15, 1950, with the following journal entry:

| Subscriptions receivable | $304,500 | |
|---|---|---|
| Capital stock | | $4,500 |
| Advances | | 300,000 |

To reflect subscriptions for capital stock and advances to be made to Aldon Homes, Inc.

The $4,500 for the issued stock was advanced initially by Oberndorfer on July 19. Between August 1950 and March 1951, a net amount of $300,000 was advanced to Aldon by various investors.

Upon completion of the above-outlined transactions Aldon's stock was held by and advances had been made by the following individuals and partnerships:

| Name | Number of shares | Advances | Name | Number of shares | Advances |
|---|---|---|---|---|---|
| Albert H. Allen | 1.125 | $15,000 | M. Shapiro | 2.475 | $25,000 |
| Morris Kawin | 1.575 | 17,500 | M. Schechter | 0 | 25,000 |
| Ira Oberndorfer | 6.675 | 45,000 | Aldon Construction Co | 1.875 | 25,000 |
| A. A. Garford | 4.95 | 50,000 | Ellis Dentist | 0 | 5,000 |
| Samuel Garford | 1.8 | 20,000 | P. Burton | .375 | 10,000 |
| M. Oberndorfer | .45 | 5,000 | Sam Yedor | .75 | 5,000 |
| N. Sherman | .9 | 10,000 | Willard Woodrow | 9.0 | 0 |
| Murray Varat | .9 | 10,000 | Donald Metz | 9.0 | 0 |
| Walker & Lee | .675 | 7,500 | | | |
| S. M. Solton | 1.2375 | 12,500 | | | |
| N. Kirschenbaum | 1.2375 | 12,500 | Total | 45.000 | 300,000 |

Aldon opened an escrow for the purchase of the abutting parcels of land in Downey on July 19, 1950, and completed the purchase of the raw land by December 15, 1950, at a cost of $204,917.98. The consolidated parcels became known as Tract 17169, and were subdivided into 237 lots to be developed under the name, Briarcliff Estates.

Between the time Aldon was organized and the time the acquisition of Tract 17169 was completed, the decision was made to develop the tract in parcels through a number of corporations. The primary reason for such a plan of development was to reduce corporate taxes and thereby increase the return to the stockholders and investors.

Pursuant to the decision to develop the tract through a number of corporations, 16 corporations, Adlon, Barca, Carab, Dolan, Efton, Fonte, Grail, Hajon, Ilgar, Johan, Kiltor, Londa, Misap, Nadle, Olang, and Pewang, were organized on or about December 15, 1950. The articles of incorporation and bylaws of the alphabet corporations were substantially identical.

On December 27, 1950, each of the alphabet corporations held a board of directors meeting. The initial board of directors was identical for each of the corporations. At the meetings the following pertinent actions were taken: Officers and directors were elected; resolutions were passed authorizing an application for a permit to sell and issue its securities, authorizing the sale and issuance of those securities; and authorizing the establishment of bank accounts. Resolutions were also passed authorizing the purchase from Aldon of specific lots in Tract 17169, and giving the officers authority to execute all instruments necessary to effectuate the purchase.

Metz was elected president of Barca, Fonte, Hajon, Johan, Misap, and Olang corporations. Woodrow was elected president of Carab,

Dolan, Grail, Londa, Kiltor, and Pewang corporations. Oberndorfer was elected president of Adlon, Efton, Ilgar, and Nadle corporations.

The minutes of the board of directors meetings of each of the corporations were substantially identical.

On December 27, 1950, Aldon sold all 237 lots in Tract 17169 to the alphabet corporations as follows: 15 lots were sold to each of 13 corporations for $14,636.25, and 14 lots were sold to each of the 3 remaining corporations for $13,660.50. The lots were all sold at the same price although they varied in size up to 25 per cent. The total sales price of the tract was $231,252.75, which equaled Aldon's total expenditures up to the date of the sale. Aldon's expenditures consisted of $204,917.98 for the land, $17,627.57 for preconstruction costs, $8,116.74 for miscellaneous expenses, including $4,652.98 for advertising, and $590.46 for organization expenses of the 16 corporations. Each of the corporations gave Aldon an unsecured note in the amount of the purchase price, and Aldon executed and delivered a separate grant deed to each of the alphabet corporations. The grant deeds were recorded on December 28, 1950. All 16 corporations were devoid of assets at the time they received title to the tract.

On December 27, 1950, each of the alphabet corporations entered into a separate "Building Agreement" with Donna Homes, Inc., which provided for Donna to act as general contractor for the construction of houses on the lots held by the respective corporations. Donna's fee was $100 per house. The alphabet corporations agreed, *inter alia*, to "make available to the Contractor such funds as shall be necessary by the Contractor to meet the obligations in connection with the project." Donna agreed, *inter alia*, to obtain the corporations' approval before entering into any subcontract agreements. Donna was organized solely for the development of Tract 17169. Metz and Woodrow each held 40 per cent and Oberndorfer held 20 per cent of Donna's stock.

The form of all 16 "Building Agreements" was substantially identical. Metz signed each of the 16 agreements on behalf of both parties to the agreement, although he was not an officer, director, or stockholder of 6 of the corporations on whose behalf he signed.

Aldon continued to make disbursements for the development of Tract 17169 after it had transferred title to the tract to the alphabet corporations. Between December 27, 1950, and March 29, 1951, Aldon spent $12,868.23 for construction costs and overhead, $19,346.25 for fixed assets, and $1,350 for organization expenses. Aldon advanced Donna $1,250, and also had advanced Billdon Company, Ltd. (another Metz-Woodrow corporation), $29,850

interest-free. A separate set of books was maintained for each of the alphabet corporations, and the above expenditures were allocated among them and recorded as liabilities to Aldon.

Between January 26 and March 20, 1951, each of the alphabet corporations opened a bank account, and had checks printed bearing its name.

On March 14, 1951, each of the alphabet corporations filed an application for permission to issue stock and debenture bonds. Permits were issued on March 21, 1951, and stocks, notes, and bonds were issued as follows:

| Corporation | Stockholders and number of shares | | Bondholders and issue price | |
|---|---|---|---|---|
| Adlon | Albert H. Allen | (15) | Albert H. Allen [1] | ($15,000) |
| | Ira H. Oberndorfer | (23) | Ira H. Oberndorfer [1] | (4,000) |
| Barca | Donald Metz | (36) | Morris Kawin | (17,500) |
| | | | Ira H. Oberndorfer | (1,500) |
| Carab | Willard Woodrow | (24) | Ira H. Oberndorfer | (19,000) |
| Dolan | Donald Metz | (6) | Ira H. Oberndorfer | (19,000) |
| | Willard Woodrow | (14) | | |
| Efton | Ira H. Oberndorfer | (21) | A. A. Garford | (19,000) |
| Fonte | Donald Metz | (34) | A. A. Garford | (19,000) |
| Grail | Willard Woodrow | (29) | Sam Garford | (19,000) |
| Hajon | Donald Metz | (17) | Marvin Oberndorfer | (5,000) |
| | Willard Woodrow | (8) | Nat Sherman | (10,000) |
| | | | Aldon Construction Co. | (4,000) |
| Ilgar | Donald Metz | (6) | Ira H. Oberndorfer | (1,500) |
| | Willard Woodrow | (9) | Murray Varat | (10,000) |
| | Ira H. Oberndorfer | (25) | Walker & Lee | (7,500) |
| Johan | Donald Metz | (19) | S. M. Solton | (12,500) |
| | | | Aldon Construction Co. | (1,500) |
| | | | Ellis Dentist | (5,000) |
| Kiltor | Willard Woodrow | (23) | Nathan Kirschenbaum | (12,500) |
| | | | Aldon Construction Co. | (1,500) |
| | | | Sam Yedor | (5,000) |
| Londa | Philip Burton | (10) | Sam Garford | (1,000) |
| | Donald Metz | (6½) | Aldon Construction Co. | (8,000) |
| | Willard Woodrow | (12⅔) | Philip Burton [1] | (10,000) |
| Misap | Donald Metz | (33) | A. A. Garford | (12,000) |
| | Willard Woodrow | (11) | Max Schechter | (5,000) |
| | | | Aldon Construction Co. | (2,000) |
| Nadle | Ira H. Oberndorfer | (16½) | Morris Shapiro | (9,700) |
| | Donald Metz | (4½) | Aldon Construction Co. | (8,000) |
| | Willard Woodrow | (9) | | |
| Oland | Donald Metz | (17) | Morris Shapiro | (7,700) |
| | | | Max Schechter | (10,000) |
| Pewang | Willard Woodrow | (26) | Morris Shapiro | (7,600) |
| | | | Max Schechter | (10,000) |
| | | | | 300,000 |

[1] Denotes noteholder rather than bondholder.

The issue price of the stock was $10 per share. The bonds were issued at a discount, the issue price being $100 on the face value of $168.

The bonds issued by the alphabet corporations were substantially identical in form. They were designated "Fifteen-Year 2% Unsecured Bonds" and were issued in registered form under trust indentures between the issuing corporations and the Title Insurance and Trust Company as trustee. The bonds' maturity date was March 29, 1966, and they provided for the payment of 2 per cent interest, payable semiannually. The bonds contained provisions for com-

plete or partial redemption prior to December 15, 1951, at $100 for each $168 face value, and after such date at face value.

The notes issued had a fixed maturity date of 1 year from date of issue, and bore interest at the rate of 9 per cent per annum, payable semiannually. The notes contained acceleration clauses permitting prepayment of principal prior to maturity.

Up to March 29, 1951, no cash had been paid to any of the alphabet corporations for the stock, notes, and bonds issued by them. On March 29, the following transactions occurred, although not necessarily in the order outlined: (1) Aldon wrote checks totaling $4,500 payable to its stockholders, thus repaying each of them the issue price of their stock; (2) Aldon wrote checks totaling $300,000 payable to the members of the investor group in the exact amounts advanced by each investor in Aldon; (3) the investors endorsed over or wrote new checks totaling $300,000 in favor of the various alphabet corporations. The checks payable to each of the alphabet corporations equaled the total issue price of the bonds and notes issued by each corporation; (4) each of the alphabet corporations drew two checks in favor of Aldon. The sum of the checks issued by such corporation equaled the sum of the checks received from the investors, and thus totaled $300,000. In short, checks totaling $300,000 passed from Aldon to the investor group, to the alphabet corporations, and back to Aldon, all on March 29, 1951. None of the parties had any more cash than they started with as a result of the $300,000 circular check transactions. Bookkeeping entries recorded the investor group's liability to the alphabet corporations for the "bonds and notes" received as satisfied, and recorded the alphabet corporations' liability to Aldon for the purchase price of the tract and Aldon's other expenditures as paid.

After Aldon opened the escrow account for the purchase of the land, it applied to the Division of Real Estate of the State of California for approval of its subdivision plan for Tract 17169. Following the customary investigation, approval was granted on December 29, 1950. Aldon Construction obtained approval for the subdivision from the Regional Planning Commission. The individual corporations filed for building permits from the county authorities, and paid the county fees. Aldon applied for and received loan guarantees from the Veterans' Administration for purchase loans on the houses to be built, and contracted with Coast Federal Savings and Loan Association for an interim construction loan for the building of the 237 houses on the tract.

In a letter dated December 18, 1950, Aldon notified the Veterans' Administration that it had "commenced work on Tract 17169." Following the transfer of the tract to the alphabet corporations, Metz

instructed Coast Federal Savings and Loan Association to make construction loans in the names of the alphabet corporations. On January 2, 1951, the alphabet corporations filed incomplete loan applications with the Coast Federal. On the same day the corporations executed the necessary loan agreements, deeds of trust, and promissory notes for the construction loans.

The alphabet corporations had not yet been organized at the time work commenced on the tract and the initial payments for construction were made by Aldon. Donna entered into contracts with various companies for construction of houses on the entire tract and instructed the companies to bill the individual alphabet corporations directly for the materials used and services rendered in the construction of houses on each corporation's lots. Donna notified Coast Federal Savings and Loan Association, "that construction was started * * * on January 20th." Substantial savings in time and money were realized by having Donna contract for the construction of the 237 houses as a group rather than by having each alphabet corporation contract for construction of houses on its 14 or 15 lots. Volume was the key to success in these developments. Donna paid bills which were submitted to it and then was reimbursed by the alphabet corporations on the basis of the number of lots held by each of them.

At all times pertinent negotiations and correspondence in relation to the development of the tract were conducted by Aldon, Aldon Construction, or Donna. With the exception of applying for building permits and the local fees thereon, the alphabet corporations were totally inactive in this respect.

Aldon's expenditures totaling $64,664.48 which were made subsequent to its transfer of the tract and prior to March 29, 1951, were charged to the alphabet corporations on the basis of the number of lots held by each corporation. Thus the corporations which held 15 lots each were charged for $15/237$ths of the expenditures, and the corporations which held 14 lots each were charged for $14/237$ths of the expenditures. The alphabet corporations' liabilities to Aldon for these expenditures were extinguished through the circular check transactions of March 29, 1951, as outlined above.

The alphabet corporations had no separate employees of their own. Donna, Aldon Construction, Aldon, and the alphabet corporations all operated from the same office at all times pertinent. One general office staff handled the books of all the corporations involved, and the cost of the staff was allocated among the corporations.

Work on the tract commenced on or about December 18, 1950, and the construction of all 237 houses was completed by August 24, 1951. The houses were built on a mass production basis, that is,

construction was initiated on lots in the first block of the subdivision and progressed lot by lot up and down the streets until the entire tract was completed. Workers moved from house to house as their phase of the work was ready to be done.

As construction progressed Coast Federal Savings and Loan Association loaned construction money to each of the alphabet corporations pursuant to its loan agreement. It loaned each of the first 13 alphabet corporations, Adlon through Misap, $180,750, and loaned the remaining 3 corporations, Nadle, Olang, and Pewang, $168,700 each.

During the period in issue Donna and the alphabet corporations loaned over $70,000 interest-free to other Metz-Woodrow-Oberndorfer controlled corporations unrelated to the development of Tract 17169. In this same period Donna borrowed $75,000 from Aldon Construction and Woodrow at 10 per cent interest. Donna paid $1,612.50 interest on the above loans and allocated the interest expense among the alphabet corporations.

Pioneer Land and Realty Company handled the sale of the houses in the entire tract. The tract was advertised as the "Briarcliff Estates," an Aldon project, with no mention of the alphabet corporations. Donna notified the Veterans' Administration in a letter dated July 20, 1951, that "the entire 237-house tract has been sold prior to the start of construction." All sales in the tract were effected through escrows in which the appropriate alphabet corporation was designated the selling party. The deeds ran from the alphabet corporation to the individual grantee involved. The sales were recorded during the months of July through November 1951. Fourteen of the alphabet corporations granted easements to public utility companies.

By December 1, 1951, the development was completed; the 237 houses had been built, inspected, approved, and sold; notices of completion filed; materialmen and contractors satisfied; and the deeds recorded.

On December 7, 1951, 11 of the alphabet corporations which had issued bonds adopted identical resolutions calling for the redemption of $19,152 face value of their bonds at $100 plus interest, said redemption to be effective on December 14, 1 day prior to penalty date. The 4 other alphabet corporations which had issued bonds adopted resolutions identical to the above-mentioned ones in every respect except the number of bonds to be redeemed.

On or about December 14 the alphabet corporations adopted resolutions calling for the redemption at face value plus interest of the remainder of their bonds outstanding, said redemption to be effective December 24, 1951. This second series of resolutions caused the alphabet corporations to pay the full penalty of $68 on each of

their bonds then outstanding. The bonds were redeemed through the Title Insurance and Trust Company pursuant to the above resolutions.

Five of the alphabet corporations had sufficient funds on hand to redeem all their bonds outstanding prior to the penalty date of December 15, 1951. The remaining alphabet corporations had sufficient advances owed to them by Donna to cover the redemption of the remaining bonds before the penalty date, and Donna had adequate funds available to repay the alphabet corporations' advances prior to the penalty date. The sole reason for not redeeming all the bonds prior to the penalty date was to effectuate the agreed 50–50 per cent split of the profits between the investor group and the management group.

On June 14, 1951, Aldon wrote checks totaling $4,082.77 to the alphabet corporations in repayment of loans. These checks reduced Aldon's cash balance to zero, and were the only recorded cash receipts or disbursements of Aldon after the series of checks written March 29, 1951.

The alphabet corporations paid a total of $6,566.13 interest on the debenture bonds in 1951, of which Barca paid $460.35. They paid total premiums of $73,780 on the redemption of the bonds, of which Barca paid $5,168. Adlon and Londa Corporations paid interest on their notes totaling $1,928.50. The corporations deducted all the above expenditures in arriving at taxable income, with the exception of Barca, which deducted only $440.88 interest instead of $460.35.

On July 5 and 6, 1951, the alphabet corporations paid Metz, Oberndorfer, and Woodrow the following amounts and charged these amounts to "General and Administrative Expense":

| Payor | Don Metz | Willard Woodrow | Ira Obern-dorfer | Total |
|---|---|---|---|---|
| Adlon Corporation | | | $230.00 | $230 |
| Barca Corporation | $360.00 | | | 360 |
| Carab Corporation | | $240.00 | | 240 |
| Dolan Corporation | 60.00 | 140.00 | | 200 |
| Efton Corporation | | | 210.00 | 210 |
| Fonto Corporation | 340.00 | | | 340 |
| Grail Corporation | | 290.00 | | 290 |
| Hajon Corporation | 170.00 | 80.00 | | 250 |
| Ilgar Corporation | 60.00 | 90.00 | 250.00 | 400 |
| Johan Corporation | 190.00 | | | 190 |
| Kiltor Corporation | | 230.00 | | 230 |
| Londa Corporation | 63.33 | 126.67 | | 190 |
| Misap Corporation | 330.00 | 110.00 | | 440 |
| Nadle Corporation | 45.00 | 90.00 | 165.00 | 300 |
| Olang Corporation | 170.00 | | | 170 |
| Pewang Corporation | | 260.00 | | 260 |
| Total | 1,788.33 | 1,656.67 | 855.00 | 4,300 |
| Ratio | 41.59% | 38.53% | 19.88% | 100% |

These identical amounts were paid in on July 17, 1951, together with $250 from Albert Allen and Philip Burton, for the common

stock issued by the alphabet corporations. Respondent disallowed the deduction of all the above expenditures with the exception of the $230 paid to Oberndorfer by Adlon. Petitioners have conceded this adjustment.

On November 8, 1951, the alphabet corporations paid Metz, Woodrow, and Oberndorfer varying amounts of money in the exact ratio of their ownership of the stock in Donna, that is, 40–40–20 per cent. Metz and Woodrow each received a net amount of $3,344.78, and Oberndorfer received a net amount of $1,672.43, after returning small amounts to the corporations on December 20, 1951. The corporations charged these amounts to travel and entertainment expense.

Aldon, Donna, and the alphabet corporations were dissolved upon completion of the tract.

The following schedules illustrate the ultimate distribution of cash to the participants in the development of the tract:

NET CASH RECEIVED FROM THE DEVELOPMENT OF TRACT 17169 BY THE MANAGEMENT GROUP

| | Travel and entertainment expense | Net in liquidation of the alphabet corporations | Net in liquidation of Donna | Total received by the management group | Percentage of total received |
|---|---|---|---|---|---|
| Donald Metz | $3,344.78 | $26,441.14 | $6,288.61 | $36,074.53 | 39.74 |
| Willard Woodrow | 3,344.78 | 26,597.84 | 6,288.61 | 36,231.23 | 39.92 |
| Ira Oberndorfer | 1,672.43 | 13,647.77 | 3,144.31 | 18,464.51 | 20.34 |
| Total | 8,361.99 | 66,686.75 | 15,721.53 | 90,770.27 | 100.00 |

NET CASH RECEIVED FROM THE DEVELOPMENT OF TRACT 17169 BY THE INVESTOR GROUP

| Participant | Net cash received via bond premiums, bond and note interest and liquidation of stock [1] | Total advances made to Aldon | Percentage of total advance | Percentage of total cash received by the investor group |
|---|---|---|---|---|
| Albert H. Allen | $4,028.23 | $15,000 | 5.00 | 4.61 |
| Aldon Construction Co | 7,405.75 | 25,000 | 8.33 | 8.48 |
| Philip Burton | 2,749.10 | 10,000 | 3.33 | 3.15 |
| Ellis Dentist | 1,481.14 | 5,000 | 1.67 | 1.70 |
| A. A. Garford | 14,811.45 | 50,000 | 16.67 | 16.95 |
| Samuel Garford | 5,924.58 | 20,000 | 6.67 | 6.78 |
| Morris Kawin | 5,166.05 | 17,500 | 5.83 | 5.91 |
| N. Kirschenbaum | 3,702.86 | 12,500 | 4.17 | 4.24 |
| Ira Oberndorfer | 12,409.88 | 45,000 | 15.00 | 14.20 |
| Marvin Oberndorfer | 1,481.14 | 5,000 | 1.67 | 1.70 |
| M. Schechter | 7,405.74 | 25,000 | 8.33 | 8.48 |
| M. Shapiro | 7,473.78 | 25,000 | 8.33 | 8.55 |
| N. R. Sherman | 2,962.29 | 10,000 | 3.33 | 3.39 |
| S. M. Solton | 3,702.86 | 12,500 | 4.17 | 4.24 |
| Murray Varat | 2,962.29 | 10,000 | 3.33 | 3.39 |
| Walker & Lee | 2,221.71 | 7,500 | 2.50 | 2.54 |
| Sam Yedor | 1,481.14 | 5,000 | 1.67 | 1.70 |
| Total | 87,369.99 | 300,000 | | |

[1] Allen and Burton received a net cash profit of $3,030.73 and $2,084.10, respectively, in the liquidation of their stock in the alphabet corporations.

As illustrated in the above schedules, the investor group received a total of $87,369.99, or 49.05 per cent of the net cash realized from the enterprise, and the management group received $90,770.27, or 50.95 per cent of the net cash realized, thereby approximately effectuating the agreed 50–50 per cent profit split between the two groups.

Respondent determined that the $300,000 contributed by the investor group was risk capital and not loans. He disallowed the alphabet corporations' deductions of bond and note interest, bond premiums, and miscellaneous expenses and arrived at a corrected net income for each of the corporations. Respondent then attributed the aggregate corrected net income of the alphabet corporations to Aldon and determined a deficiency against Aldon, stating:

> It is determined that the corporate identities of the 16 related corporations listed below are to be disregarded, and the transactions by them involving the raw land and its development by the construction of 237 homes for sale, are steps in a single transaction. The corrected taxable net income of Aldon Homes, Inc., is $187,099.32 for the taxable year June 1, 1951 to December 31, 1951, pursuant to the provisions of sections 22(a) and 45 of the Internal Revenue Code of 1939, * * *

As an alternative respondent issued a deficiency notice to Barca Corporation, stating:

> It is determined that you are a transferee corporation of Aldon Homes, Inc., and such transferor corporation or its stockholders, or both, are in control of you as transferee, and, therefore, under the provisions of section 15(c) of the Internal Revenue Code of 1939 your surtax exemption and minimum excess profits credit is disallowed.
>
> A single exemption from surtax of $25,000 has been allocated equally among 16 transferee corporations of Aldon Homes, Inc., Transferor, and you have been allowed a surtax exemption of $1,562.50 as one of the transferee corporations.
>
> A single minimum excess profits credit allowable under section 129(b) of the Internal Revenue Code of 1939 has been allocated equally among the 16 transferee corporations of Aldon Homes, Inc., Transferor, and you have been allowed a minimum excess profits credit of $1,562.50 as one of the transferee corporations.

Respondent also disallowed Barca Corporation's deductions of bond interest, bond premiums, and miscellaneous expenses, stating that the deductions for expenditures relating to the bonds "are not ordinary and necessary business expense, but are held to be distributions from earnings and profits to your stockholders."

The $300,000 advanced by the investor group was not an indebtedness, but was a contribution of risk capital and represented an equity investment in the enterprise. The payments of bond and note interest and bond premiums were intentional distributions of profits to the nominal bond and noteholders.

OPINION.

The principal questions presented in these proceedings arise out of the use of multiple corporations in the development of a tract of land for residential purposes. Respondent determined that the entire net income from the development of such tract is taxable to the petitioner, Aldon Homes, Inc., under the provisions of sections 22(a)[2] and 45[3] of the Internal Revenue Code of 1939.

In support of his determination, respondent contends that the entire income from the development of Tract 17169 is attributable to Aldon under the provisions of section 22(a) because the 16 alphabet corporations were not "tax-worthy" entities in that they were not formed for any business purpose, did not function in income-producing capacities, and lacked substance and reality. Alternatively, respondent argues that, in the event it is concluded the income derived from the development of Tract 17169 is not attributable to Aldon under section 22(a), by reason of the fact that the alphabet corporations were not "tax-shams," such income is nevertheless properly allocable to Aldon under section 45 as the corporate entity which created, earned, and controlled the income.

Both parties are apparently in agreement that none of the issues raised in the Barca Corporation case (Docket No. 60021) will be reached in the event respondent is sustained on either of the issues mentioned above; that the Barca case is, in effect, an alternative to the Aldon Homes case. Accordingly, and in view of our conclusions hereinafter discussed respecting the primary issues, it is deemed unnecessary to set forth the contentions of the parties relating to the application of sections 129, 45, and 15(c) in the Barca case.

With respect to respondent's first contention, petitioners argue that the 16 alphabet corporations were real, viable business entities and not mere shams; that they were organized to perform business

---

[2] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

[3] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances, between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

596

functions and thereafter actually engaged in business; that they and not Aldon, which was inactive during the taxable period, earned the income in dispute; and accordingly, that the alphabet corporations cannot be disregarded and the income taxed to Aldon under section 22(a). Petitioners further argue that section 45 does not authorize the Commissioner to combine and consolidate the net income of the 16 alphabet corporations and attribute such net income to Aldon.

Respondent's first contention raises the familiar problem of form versus substance. It is axiomatic that taxpayers have the right to mold business transactions in such a manner as to minimize the incidence of taxation, for no taxpayer is obligated to pay more tax than the law demands of him. *United States* v. *Isham*, 84 U.S. 496; *Gregory* v. *Helvering*, 293 U.S. 465; *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451.

In *Higgins* v. *Smith*, 308 U.S. 473, the Supreme Court, although recognizing that "[a] taxpayer is free to adopt such organization for his affairs as he may choose," nevertheless stated:

On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is *unreal or a sham* may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property. [Emphasis supplied.]

In *National Investors Corp.* v. *Hoey*, (C.A. 2) 144 F. 2d 466, 468, Judge Learned Hand pointed out that:

to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term "corporation" will be interpreted to mean a corporation which does some "business" in the ordinary meaning; and that escaping taxation is not "business" in the ordinary meaning.

In *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334, the Supreme Court stated:

The incidence of taxation depends upon the substance of a transaction. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

As was earlier stated by the Supreme Court in *Gregory* v. *Helvering*, *supra*, "To hold otherwise would be to exalt artifice above reality, and to deprive the statutory provisions in question of all serious purpose."

The above cases make it clear that a taxpayer may adopt any form he desires for the conduct of his business and that form cannot be

ignored merely because it results in a tax saving. However, to be afforded recognition the form the taxpayer chooses must be a viable business entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436; *Jackson* v. *Commissioner*, (C.A. 2, 1956) 233 F. 2d 289. Escaping taxation is not a substantive business activity. *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422, footnote 20, citing *National Investors Corp.* v. *Hoey, supra.*

We do not understand petitioners to dispute the principles announced by the above cases, but rather to argue that when properly applied to the facts of this case they support petitioners' contentions On brief, after discussing these and other cases, they state:

Accordingly, the question for decision here is whether the sixteen corporations, Adlon through Pewang, carried on the business activity which resulted in the profits from the development of Tract 17169, or whether, on the other hand, they were sham corporations which collectively existed merely as the alter ego of Aldon Homes. * * *

Petitioners have gone to great lengths, both on trial and on brief, to demonstrate that the 16 alphabet corporations were viable business entities organized for substantial business purposes other than to obtain tax benefits; that they actually engaged in substantial business activities; and that they and not Aldon earned the income in dispute.

After careful consideration of all the evidence presented and of the authorities cited, however, we have concluded that the 16 alphabet corporations, Adlon through Pewang, were not organized for any purpose other than the obtaining of tax benefits; that they did not carry on the business activities which resulted in the profits from the development of Tract 17169, nor any substantial business activities, and consequently did not earn the income in question; that, though legal entities in form, for purposes of taxation, they were unreal or shams and are to be disregarded.

Petitioners argue that the development of Tract 17169 through 16 corporations rather than through 1 served a number of business purposes: (1) That it enabled the avoidance of a possible general claim against the entire project in the event the development of any portion of the tract was a business failure; (2) that it limited possible tort liability; (3) that it eased the handling of mechanics' liens; and (4) that it facilitated the attraction of capital by reducing corporate taxes and thereby increasing the return to the parties. We are convinced, however, from our study of all the facts and circumstances that none of the alleged advantages in the use of multiple corporations in the development of Tract 17169 constituted any

actual business purpose in the instant case. The alleged business purposes impressed us simply as a lawyer's marshaling of possible business reasons that might conceivably have motivated the adoption of the forms here employed but which in fact played no part whatever in the utilization of the multiple corporate structure. Cf. *Clearview Apartment Co.*, 25 T.C. 246, 253.

The enumerated purposes were little more than mere recitals by the witness Albert H. Allen, an attorney for Aldon Construction Company, who, with other tax counsel, recommended the multiple corporation plan and performed the legal work in connection with the organization of Aldon and the alphabet corporations, and who was also one of the investors in the project. There was little or no demonstration as to how they would operate to the economic benefit of Aldon or the alphabet corporations. Particularly is this true of the purpose to avoid the possibility of a "general claim" against the total project. We are left to surmise what the nature of such a claim might be with little to stimulate our imagination in this respect, except the reference to a suit resulting from an accident in the development of another tract. This, however, would appear to fall under the limitation of tort liability purpose. The benefits to be derived in this area from the use of multiple corporations are likewise unclear, particularly in view of the known custom of construction companies, as well as most businesses, to carry liability insurance, and the operation of workmen's compensation laws. The income tax returns filed by the alphabet corporations wherein deductions were claimed by each, in substantially the same amounts, for both "General" and "Workmen's Compensation" insurance, indicate they were fully protected in both respects. The stockholders already had the benefit of a "corporate shield" in Aldon, and on the evidence shown, the seeking of additional insulation through the formation of 16 more "corporate shields" was at best of minimal business significance. The first two enumerated purposes are further minimized by reason of the promises made (and later carried out) by the management group to share 50–50 with the investor group all profits derived from the development of the entire tract. Thus, the recovery of a "general" or "tort" claim against any portion would be spread over the entire tract.

We also see little merit in the contention that the use of multiple corporations was necessary to facilitate the handling of mechanics' liens. As a general rule mechanics' as well as materialmen's liens, are related in time of filing and in liability to the particular building or improvement for which they are furnished, though this may be and frequently is changed by the contract or arrangement under which they are supplied. See 36 Am. Jur., Mechanics' Liens, secs.

167–175. Here the houses were built on a mass production basis, that is, construction was initiated on lots in the first block of the subdivision and progressed lot by lot up and down the streets until the entire tract was completed. Workers moved from house to house as their phase of the work was ready to be done. Presumably materialmen's and mechanics' liens attached to the houses as completed and it is not made clear to us how the use of multiple corporations would "ease the handling of mechanics' liens" to any greater extent. As to the amounts of such liens, they too would be spread over the entire project if necessary to carry out the 50–50 division of profits. The recited purpose relating to the handling of mechanics' liens, as in the case of the first two enumerated purposes, was but a "make weight" factor secondary to the parties' primary objective of avoiding taxes.

Petitioners' argument that the use of the multiple corporate structure facilitated the attraction of capital by reducing corporate taxes and thereby increasing the return to the parties must also fail as a substantial business purpose. To hold otherwise would enable the clothing of any tax avoidance or tax evasion scheme with a business purpose, contrary to the statement of the Court of Appeals in *National Investors Corp.* v. *Hoey*, quoted above, that "escaping taxation is not a 'business' in the ordinary meaning." No difficulty whatever was experienced in obtaining sufficient capital to purchase the raw land and begin operations prior to the establishment of the 16 alphabet corporations. Some of the investor group testified they would have invested more if they had been permitted. The entire $300,000 was advanced to Aldon in the first instance and only later transferred to the alphabet corporations through a "round-robin" series of transactions. Not only were the advances by the investor group made to Aldon prior to the formation of the alphabet corporations, but even after the latter were organized, as the evidence indicates, the individual investors were given no choice as to the particular alphabet corporation or corporations to which their interests would be transferred; they were merely furnished a mimeographed document showing the various assignments of interest which had been made by those in control of the project.

Also, the development of Tract 17169 was virtually guaranteed to be a business success before any part of it was transferred to the alphabet corporations. Metz and Woodrow, through Aldon Construction Company, had successfully developed a number of tracts and built thousands of houses prior to the development of Tract 17169. Their reputations as builders and the reputation of Aldon Construction were excellent. The president of one savings and loan institution testified, "There was competition for loans on houses on

which he [Metz] had built." In a letter dated July 20, 1951, Donna notified the Veterans' Administration that "the entire 237-house tract has been sold prior to the start of construction." Work had started on the project on or about December 18, 1950, several days before Aldon transferred the land to the various alphabet corporations. In an attempt to discount the above statement, petitioners argue that there could have been no "completed sale" prior to completion of the house. True, but there could have been "contracts to purchase" if and when completed, or escrow arrangements, which was the case here.

We next consider the extent, if any, to which the alphabet corporations actually engaged in independent substantive business activity.

In support of their contention that the alphabet corporations carried on the business activity which resulted in the profits from the development of Tract 17169, petitioners point to the following:

After their incorporation, each of the sixteen corporations held meetings, adopted by-laws, elected officers and directors, and issued stock and other securities. Each of them kept its own complete books and records separate and apart from those of Aldon Homes. Each also opened and maintained a separate bank account and made numerous and substantial deposits in and withdrawals from said account in transacting business.

Each owner corporation, and not Aldon Homes, borrowed the construction money for the building of the houses on its land, and executed a deed of trust as security for its note. Each of them, and not Aldon Homes, obtained the necessary plan check and building permit from the appropriate local agency, and granted the necessary easements to the electric power and telephone utility companies. Each of them, and not Aldon Homes, employed the general contractor to build the houses and disbursed the construction money to pay the contractor and the subcontractors. During the entire period of construction of the houses which produced the income in issue, each of the sixteen corporations held title to fourteen or fifteen lots in Tract 17169 under deeds which were officially recorded. Further, each of them, and not Aldon Homes, employed a real estate agent to sell the completed houses, and thereafter sold the houses through that agent to the individual purchasers.

The above circumstances have received our careful consideration. They do not, however, tell the whole story, and, when considered in connection with all the facts and circumstances, we think it clear that they were not the substantive business activities which produced the income in question.

Holding corporate meetings, adopting bylaws, electing officers and directors, and issuing stock and other securities, though necessary steps in preparation for the carrying on of business activities, were merely formal acts of organization and were not substantive income-producing activities. Nor did the keeping of separate books for each of the corporations, of itself, constitute such business activity. All 16 of the alphabet corporations were organized and dissolved in unison. Their original incorporators were identical and their arti-

cles of incorporation and minutes of meetings were substantially identical. The stock of the corporations was held almost exclusively by Metz, Woodrow, and Oberndorfer, the controlling stockholders of Aldon. The same office staff, occupying the same office space, kept the books for all the corporations.

The entire development of Tract 17169, from the purchase of the raw land to the construction of the 237 houses thereon, was a single or package transaction, every material step in which was taken by Aldon or those who controlled it. Moreover, and what is perhaps the most significant fact, Aldon, or those who controlled it, controlled the distribution of the profits derived from the development of the tract as a whole.

Prior to 1950, Metz and Woodrow, together with Albert Leighton, operating as the Aldon Construction Company, a corporation, had been engaged in developing a number of tracts of land in southern California for single-family housing purposes. Leighton died in mid-1950 and thereafter the corporation was dissolved and a partnership, composed of Metz, Woodrow, and Ira Oberndorfer, was formed under the same name to carry on the development of housing subdivisions. Metz and his associates became interested in the development of a number of abutting undeveloped parcels of land as a single residential tract, later designated as Tract 17169 and advertised as the "Briarcliff Estates."

In order to carry out their plans, Aldon Homes, Inc., was organized and the entire 45 shares of capital stock issued to Metz, Woodrow, and Oberndorfer. A number of individuals, who had previously invested in the development of other tracts by Metz and his associates, were offered an opportunity to invest in the development of Tract 17169, with the understanding that the profits therefrom would be divided 50–50 between the management group (Metz, Woodrow, and Oberndorfer) and the investor group.

The investor group advanced $300,000 to Aldon, $204,917.98 of which was used by Aldon to purchase the raw land and the remainder for various other purposes as more fully set forth in our findings. At least $33,564.48 was spent by Aldon, after the land was transferred to the alphabet corporations, for construction costs and overhead, for fixed assets and organization expenses. A substantial amount was loaned to another Metz-Woodrow corporation without interest.

An escrow for the purchase of the land was opened by Aldon on July 19, 1950. Thereafter Aldon applied for and obtained the approval of the Division of Real Estate of the State of California of the subdivision plan Metz and his associates had worked out for Tract 17169. Aldon Construction obtained the approval of the

Regional Planning Commission for the subdivision. Without these approvals the individual house-building permits could not have been obtained from the local county officials.

Aldon applied for and received loan guarantees from the Veterans' Administration for purchase loans on the houses to be built. It also contracted with Coast Federal Savings and Loan Association for an interim construction loan for the building of the entire 237 houses on Tract 17169. The Veterans' Administration's guaranty was based upon the consideration of the plans, prices, and values submitted to it by Aldon for the entire 237-house tract and made it possible for Aldon to obtain the construction loan commitment since the Veterans' Administration guaranty of the purchase money mortgages would remove the element of long-term risk to the local lending institutions. The testimony indicates the alphabet corporations could not separately and independently have obtained construction loans on the favorable terms obtained by Aldon. After the lots had been transferred to the alphabet corporations, Metz instructed Coast Federal to make construction loans in the names of the alphabet corporations and each of the latter filed incomplete applications therefor with Coast Federal and executed loan agreements, deeds of trust, and promissory notes for the construction loans, thus carrying out in form the appearance of separate corporate activity.

Donna Homes, Inc., was organized solely for the purpose of acting as general contractor in the construction of the houses on Tract 17169. Metz and Woodrow each held 40 per cent and Oberndorfer held 20 per cent of Donna's stock. On December 27, 1950, the same date the lots were transferred to them by Aldon, each of the alphabet corporations entered into a separate building agreement with Donna providing that Donna should act as general contractor for the construction of houses on the lots held by them. The forms of all these agreements were substantially identical. Metz signed each of the 16 agreements on behalf of both parties to the agreement, notwithstanding he was not an officer, director, or stockholder of 6 of the corporations on whose behalf he purportedly signed, and the capacity in which he purported to sign the others is not shown. Obviously these did not constitute arm's-length transactions.

Donna entered into contracts with various companies for the construction of the houses on the entire tract, thus realizing substantial savings in time and money by contracting for the construction of the 237 houses as a group. The houses were built on a mass production basis, that is, construction started on lots in the first block of the subdivision and progressed lot by lot up and down the street until the entire tract was completed.

True, Donna instructed the companies with which it contracted, to bill the individual alphabet corporations directly for the mate-

rials and services used in the construction of the houses on the lots of the respective corporations and Donna was reimbursed by the alphabet corporations for bills paid by it on the basis of the number of lots held by each of them. This, too, carried out, in form, the appearance of separate corporate activity. None of the alphabet corporations, however, had any separate employees of its own. Donna, Aldon Construction, Aldon, and the alphabet corporations all operated from the same office. One general office staff handled the books of all the corporations involved and the cost of the staff was allocated among the various corporations.

One realty company handled the sale of all the houses in the tract. The tract was advertised as the "Briarcliff Estates," an "Aldon" project, with no mention of the alphabet corporations, and there is no evidence the alphabet corporations had any independent or direct contact with the sales agency with respect to the conduct of the sales campaign, though, of necessity, the deeds to the purchasers were executed by the alphabet corporation which held the record title to the respective lot when the sale was completed. In view of all the circumstances related above, we place little importance in the fact that the corporations held and conveyed the legal title to the land.

In view of the above, we have concluded that the alphabet corporations carried on no separate independent income-producing activities and served no function except as corporate devices to split the income from the development of Tract 17169 and reduce taxes. They were mere corporate shells acting as conduits for Aldon. Every material step in the production of the income was taken by Aldon or those who controlled it.

It is also evident that Aldon and those who controlled it did not regard the alphabet corporations as independent entities or treat them as such. The transfers of the lots to the various alphabet corporations were clearly not bona fide arm's-length transactions. Aldon transferred lots to the corporations at a uniform price notwithstanding the lots varied in size up to 25 per cent. Aldon "sold" the lots at its own cost. At the time of the sale, the alphabet corporations had no assets and had not yet been authorized to issue stock. They gave Aldon unsecured notes in the amount of the purchase price. Also, Aldon made additional expenditures in connection with the development of the tract after it had conveyed title to the lots to the alphabet corporations.

Other incidents indicating an absence of arm's-length dealing and failure to treat the alphabet corporations as independent entities, include interest-free loans made to other Metz-Woodrow-Oberndorfer controlled corporations by the alphabet corporations during the same period interest at 10 per cent was allocated to the alphabet corporations on borrowings from Aldon Construction and Woodrow,

604

and also the handling of bond redemptions, whereby the alphabet corporations were caused to pay $73,780 in bond premiums admittedly in order to effect the 50–50 split in profits between the investment group and the management group, when sufficient funds were available within the alphabet corporations and Donna to redeem all the bonds prior to the penalty date and thus avoid the payment of the bond premiums.

Finally, and what is perhaps the most significant fact herein, Aldon, through its controlling stockholders, not only controlled but in fact, through its handling of the bond redemptions, directed the disposition of the profits from the overall development of Tract 17169 in a manner inconsistent with petitioners' contention that the alphabet corporations were real, viable business entities and not mere tax shams.

On December 7, 1951, 11 of the alphabet corporations which had issued bonds adopted identical resolutions calling for the redemption of $19,152 face value of their bonds at $100 plus interest, said redemption to be effective on December 14, 1 day prior to penalty date. The 4 other alphabet corporations which had issued bonds adopted resolutions identical to the above-mentioned ones in every respect except the number of bonds to be redeemed.

On or about December 14 the alphabet corporations adopted resolutions calling for the redemption at face value plus interest of the remainder of their bonds outstanding, said redemption to be effective December 24, 1951. This second series of resolutions caused the alphabet corporations to pay the full penalty of $68 on each of their bonds then outstanding. The bonds were redeemed through the Title Insurance and Trust Company pursuant to the above resolutions.

Five of the alphabet corporations had sufficient funds on hand to redeem all their bonds outstanding prior to the penalty date of December 15, 1951. The remaining alphabet corporations had sufficient advances owed to them by Donna to cover the redemption of the remaining bonds before the penalty date, and Donna had adequate funds available to repay the alphabet corporations' advances prior to the penalty date. The sole reason for not redeeming all the bonds prior to the penalty date was to effectuate the agreed 50–50 per cent split of the profits between the investor group and the management group.

In *Higgins* v. *Smith, supra,* the Supreme Court stated: "It is command of income and its benefits which marks the real owner of property."

The alphabet corporations were but the mechanical instruments which amplified the tune, the melody and lyrics of which had been

composed and written by Aldon, and it was Aldon, through its controlling stockholders, which controlled the tempo and the finale—the distribution of the profits. It is not to be overlooked that Metz, Woodrow, and Oberndorfer were not only the controlling stockholders of Aldon but that separately or together they were also the controlling stockholders in each of the alphabet corporations, and so, had absolute control of the instruments which played the tune. As was once said by Judge Learned Hand, "[A] melody is more than the notes." *Helvering* v. *Gregory*, 69 F. 2d 809.

Considering all the facts and circumstances herein, it is our opinion, and we so hold, that the entire net income derived from the development of Tract 17169 is taxable to the petitioner, Aldon Homes, Inc., under the provisions of section 22(a).

In view of our holding on the first issue we find it unnecessary to consider the alternative contention that respondent correctly attributed the combined net income of Barca and the other alphabet corporations to Aldon under the provisions of section 45 and we do not reach the issues presented in Docket No. 60021.

The remaining issue to be considered is whether the $300,000 paid in by the investor group constituted risk capital or loans to the alphabet corporations. The determination of this issue will resolve the question of whether the payments of "bond and note interest and bond premiums" by the alphabet corporations were deductible expenditures or were nondeductible distributions of profits.

Petitioners argue that the bonds and notes issued had all the essential requisites of an indebtedness, and that the parties intended an indebtedness to be created. They point out that many of the bondholders were not stockholders and vice versa, and contend that because there was no identity of interest between bondholder and stockholder groups, the groups had adverse interests which must be recognized. They also point out that payments of profits "in lieu of interest" are deductible within section 23(b). Petitioners urge that in view of the above considerations, the fact that the corporations had a "thin" capitalization is insignificant and that the corporations' deductions of bond and note interest and bond premiums must be sustained.

The decision of this issue must rest substantially upon the evidence before the Court, and for this reason a review and analysis of the numerous cases cited by the parties would serve little purpose.

Respondent concedes, as indeed he must, that the bonds and notes in question have the formal characteristics of an indebtedness. However, our decision is not bound by the formal characteristics the parties' transactions assumed, *Commissioner* v. *Proctor Shop, Inc.*, (C.A. 9, 1936) 82 F. 2d 792; *Isador Dobkin*, 15 T.C. 31, affd. (C.A.

2, 1951) 192 F. 2d 392, but is limited only by the scope of the evidence before us.

In our opinion the evidence indicates that the bonds and notes in question did not represent bona fide indebtedness, but rather, represented "risk capital." The $300,000 paid in by the investor group was virtually the only contributed capital in the enterprise. Aldon refunded the $4,500 contributed by its stockholders and the alphabet corporations distributed $4,300 to their stockholders before they paid in identical amounts for their stock. The only capital contributed and retained by the corporations for operations aside from the $300,000 of the investor group was $250,[4] hardly sufficient capital for such an enterprise.

The $300,000, except for the amount loaned other Metz-Woodrow-Oberndorfer corporations, was utilized for. the purchase of the land and to initiate its development. This fact in itself raises a strong presumption that the $300,000 was a contribution to capital, *Isador Dobkin, supra*, especially when coupled with the extremely "thin" capitalization of $4,550 common stock, $330,000 bonds and notes, and $2,855,850 construction loans, an average equity-debt ratio of 1 to 700 for the 16 corporations. The individual corporations' debt-equity ratio ranged from 1 to 444 to 1 to 1051.

Testimony of two bondholders indicates that they did not invest merely in bonds paying 2 per cent interest, but that they conceived. of their investments as entitling them to proportionate shares of the profits from the development. This testimony is buttressed by the admitted understanding between the investment group and the management group that the profits would be split equally between them, and by the fact that the investors were assigned bonds in the various corporations without any indication of preference on their parts.

According to the terms of the bonds, the corporations would have been within their rights to redeem the bonds prior to the penalty date. We are convinced that the corporations had access to sufficient funds to satisfy the entire indebtedness rather than part of it before the penalty date and thereby could have saved a very substantial portion of the profits for the nominal stockholders. We do not mean to "second guess" the decision of the corporations' management to hold off redeeming the entire bond issue prior to the penalty date. The bonds were redeemed according to a plan deliberately designed to split the corporations' profits between the bondholders and stockholders, groups which theoretically should have had adverse interests. The fact that the controlling stockholders deliberately allowed such an occurrence indicates almost conclusively

---

[4] Albert Allen paid in $150 to Adlon and Philip Burton paid in $100 to Londa.

that the bonds were not intended to be indebtedness, but in fact represented risk capital. As illustrated in the Findings of Fact, the investor group and management group split the profits almost equally between them, and each group split its share of the profits among its members according to their respective interests.

The above comments are equally applicable to the notes in question. Adlon and Londa are indistinguishable from the other 14 alphabet corporations. The three investors who received notes instead of bonds participated in the profits proportionately with the rest of the investor group.

In view of the above considerations and of the record as a whole we conclude that the $300,000 was not intended to be, nor was it in fact, a loan, but was risk capital representing an equity interest in the development of Tract 17169. We further conclude that the corporations' expenditures in the form of interest on bonds and notes and premiums on the redemption of bonds were in fact intentional distributions of profits.

The cases[5] cited by petitioners in which courts have allowed taxpayers to deduct as interest payments of profits "in lieu of interest," are distinguishable from the instant case. Those cases all involved written agreements between the parties providing for payments of profits in lieu of interest. In the instant case the terms of the "indebtedness" did not provide for a division of the profits.

Under the circumstances, the lack of identity of interests between the stockholder and bondholder groups is of little significance. *Colony, Inc.*, 26 T.C. 30, affd. (C.A. 6, 1957) 244 F. 2d 75, reversed on other grounds 357 U.S. 28 (1958).

Accordingly, the alphabet corporations' deductions for bond and note interest and bond premiums are disallowed, and the resulting income is attributable to Aldon pursuant to the decision in the first issue.

Reviewed by the Court.

*Decision will be entered for the respondent in Docket No. 60020, and decision of "No deficiency" will be entered in Docket No. 60021.*

OPPER, *J.*, concurring: It is easy to sympathize with a certain reluctance to rely here specifically on section 45, I.R.C. 1939. But it seems to me that respondent did here precisely what he did in *Advance Machinery Exch.* v. *Commissioner*, (C.A. 2, 1952) 196 F. 2d 1006, and that that case is a direct authority supporting the present conclusion. There, the court said (p. 1008):

5 *Dorzback* v. *Collison* (C.A. 3, 1952) 195 F. 2d 69; *Erwin de Reitzes-Marienwert*, 21 T.C. 846; *Stevens Brothers & Miller-Hutchinson Co.*, 24 T.C. 953.

608

We need not decide whether what the Commissioner did is sustainable under § 22(a), I.R.C. alone * * * since we think § 45 is applicable to this situation despite the petitioner's contention that what the Commissioner has done amounts to a consolidation of the income of the various entities * * *

There follows an elaborate discussion of the relationship between section 45 and the consolidated return provision, with the conclusion that (p. 1009):

[T]he purpose of § 45 is to prevent tax evasion by any arbitrary shifting of gross income among businesses owned or controlled by the same interests. * * * There is no exception, nor any reason for excepting, from this purpose the case where such arbitrary allocation of income is among affiliated corporations who could, under § 141, consolidate their respective incomes. Furthermore, subdivision (i) of § 141 contains this language: "For allocation of income and deductions of related trades or businesses, see section 45." * * *

*Commissioner* v. *Chelsea Products*, (C.A. 3, 1952) 197 F. 2d 620, affirming 16 T.C. 840, which apparently held to the contrary, can be distinguished, at least, because of the conclusion of the court on appeal that "[t]he [deficiency] notices contain no indications whatsoever that the Commissioner made his determination under Section 45." And the statement there (footnote 6, p. 624) that the "observation" in *Advance Machinery Exch.* v. *Commissioner*, *supra*, "with respect to § 45" was considered "to be essentially dicta [*sic*]" is puzzling to say the least, the only question decided in *Advance Machinery* being the applicability of section 45, and the court there having expressly refrained from considering "§ 22(a), I.R.C. alone."

Since, however, I regard *Commissioner* v. *Chelsea Products*, *supra*, as having been erroneously decided, and since the present result seems to me clearly authorized by the decision of another circuit [1] in *Advance Machinery Exch.* v. *Commissioner*, *supra*, I concur in the result.

MURDOCK, *J*: I have no comment on the *Chelsea* case but otherwise agree with this concurring opinion.

HARRON, *J.*, agrees with this concurring opinion.

---

[1] To complicate matters further, Chief Judge Biggs of the Third Circuit apparently sat with the Second Circuit when it decided *Advance Machinery Exch.* v. *Commissioner*, (C.A. 2, 1952) 196 F. 2d 1006.