SHAW CONSTRUCTION CO., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 68589–68593, 68595–68597, 68599–68610, 68619–68632, 68695–68699, 68700–68707, 68726–68730, 68740–68751, 68793–68799, 68800–68815. Filed March 21, 1961.

---

[4] Sec. 1.174-2 (T.D. 6255, filed Oct. 3, 1957) :

[1] Proceedings of the following petitioners are consolidated herewith : Nueve, Inc., Docket No. 68590 ; Once, Inc., Docket No. 68591 ; Seis, Inc., Docket No. 68592 ; Viente Tres, Inc., Docket No. 68593 ; Viente, Inc., Docket No. 68595 ; Trece, Inc., Docket No. 68596 ; Doce,

Inc., Docket No. 68597; Dos, Inc., Docket No. 68599; Diez Siete, Inc., Docket No. 68600; Diez Ocho, Inc., Docket No. 68601; Diez, Inc., Docket No. 68602; Diez Nueve, Inc., Docket No. 68603; M. J. Development Company, Docket No. 68604; A & R Tyree, Inc., Docket No. 68605; Cinco, Inc., Docket No. 68606; C & R Tyree, Inc., Docket No. 68607; Tres, Inc., Docket No. 68608; Viente Siete, Inc., Docket No. 68609; Diez Seis, Inc., Docket No. 68610; E & R Tyree, Inc., Docket No. 68619; Houser-Whitney Company, Inc., Docket No. 68620; J. D. Development Co., Docket No. 68621; F & R Tyree, Inc., Docket No. 68622; Quince, Inc., Docket No. 68623; B & R Tyree, Inc., Docket No. 68624; Cuatro, Inc., Docket No. 68625; D & R Tyree, Inc., Docket No. 68626; Viente Ocho, Inc., Docket No. 68627; Viente Uno, Inc., Docket No. 68628; Viente Seis, Inc., Docket No. 68629; Siete, Inc., Docket No. 68630; Uno, Inc., Docket No. 68631; Viente Cinco, Inc., Docket No. 68632; White and Goodere Construction Co., Docket No. 68695; Treinta Tres, Inc., Docket No. 68696; Cuarenta, Inc., Docket No. 68697; Treinta Ocho, Inc., Docket No. 68698; Treinta Uno, Inc., Docket No. 68699; Cuarenta Uno, Inc., Docket No. 68700; Treinta Cinco, Inc., Docket No. 68701; Viente Cuatro, Inc., Docket No. 68702; J & S Leigh, Inc., Docket No. 68703; Catorce, Inc., Docket No. 68704; G & R Tyree, Inc., Docket No. 68705; M & S Leigh, Inc., Docket No. 68706; G & S Leigh, Inc., Docket No. 68707; Leigh Investment Co., Docket No. 68726; W & S Leigh, Inc., Docket No. 68727; S & S Leigh, Inc., Docket No. 68728; Tyree Investment Co., Docket No. 68729; R & R Tyree, Inc., Docket No. 68730; W & R Tyree, Inc., Docket No. 68740; Treinta Siete, Inc., Docket No. 68741; Treinta Seis, Inc., Docket No. 68742; Treinta Cuatro, Inc., Docket No. 68743; Treinta Dos, Inc., Docket No. 68744; Treinta Nueve, Inc., Docket No. 68745; T & R Tyree, Inc., Docket No. 68746; H & R Tyree, Inc., Docket No. 68747; K & R Tyree, Inc., Docket No. 68748; L & R Tyree, Inc., Docket No. 68749; N & R Tyree, Inc., Docket No. 68750; T & S Leigh, Inc., Docket No. 68751; D & S Leigh, Inc., Docket No. 68793; N & S Leigh, Inc., Docket No. 68794; L & S Leigh, Inc., Docket No. 68795; E & S Leigh, Inc., Docket No. 68796; H & S Leigh, Inc., Docket No. 68797; O & S Leigh, Inc., Docket No. 68798; B & C Shell, Inc., Docket No. 68799; A & C Shell, Inc., Docket No. 68800; D & C Shell, Inc., Docket No. 68801; R & S Leigh, Inc., Docket No. 68802; O & R Tyree, Inc., Docket No. 68803; M & R Tyree, Inc., Docket No. 68804; S & R Tyree, Inc., Docket No. 68805; Viente Dos, Inc., Docket No. 68806; Treinta, Inc., Docket No. 68807; C & S Leigh, Inc., Docket No. 68808; Viente Nueve, Inc., Docket No. 68809; C & C Shell, Inc., Docket No. 68810; F & S Leigh, Inc., Docket No. 68811; K & S Leigh, Inc., Docket No. 68812; Firestone Water Co., Docket No. 68813; E & C Shell, Inc., Docket No. 68814: and Shaw Land Co., Docket No. 68815.

*Ernest R. Mortenson, Esq.,* and *Eugene Harpole, Esq.,* for the petitioners.

*Donald P. Chehock, Esq., Walter S. Weiss, Esq.,* and *Allan I. Blau, Esq.,* for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in income tax and excess profits tax against Shaw Construction Company in Docket No. 68589 for its fiscal years ending March 31, 1952 and 1953, in the amounts of $436,687.98 and $2,087,004.98, respectively; and with respect to 86 "multiple" corporations, with various fiscal years ending in 1951, 1952, and 1953, respondent in 86 dockets determined deficiencies in taxes and additions to tax totaling $932,870.09 and $322.29, respectively. Deficiency determinations with respect to two other corporations (Caleasco, Inc., and Passmore Development Co.), three Robinson trusts, and Harold L. and Martha J. Shaw jointly, all of whom participated in one or more of the real estate developments under consideration, are not before the Court in the instant case.

The principal issues remaining for decision are: (1) Whether income produced from the development and sale of lots in 13 tracts and reported on the tax returns by 88 corporations, 3 trusts, and an individual is attributable and taxable to Shaw Construction Company under section 22(a) or section 45 of the Internal Revenue Code of 1939;[2] if not, and alternatively, (2) with respect to the 86 corporation dockets before the Court, whether each of the corporations is entitled to its own surtax exemption and excess profits credit or to only an allocate share of a single exemption and credit, pursuant to any or all of the provisions of sections 15(c), 45, and 129 of the Code. Should respondent be sustained on the first issue there is a subsidiary question involving the proper year for the deduction of construction costs relating to two tracts.

### FINDINGS OF FACT.

Some of the facts are stipulated and are found as stipulated.

Shaw Construction Company and the other petitioner corporations involved herein are corporations organized under the laws of the State of California, and filed their income tax returns with the district director of internal revenue at Los Angeles, California.

---

[2] All references are to the Internal Revenue Code of 1939.

Shaw Construction Company was incorporated in April 1946 under the name of Pre-Cut Housing, Inc., which in 1946 and 1947 was successively changed to Shaw Manufacturing Company and Shaw Construction Company. All of the outstanding capital stock of the corporation, 10,000 shares at $1 par value each, has at all times been owned in equal parts by Harold L. Shaw and his wife, Martha J. Shaw. Since incorporation, Harold L. Shaw and Martha J. Shaw have served as president and secretary-treasurer, respectively, of Shaw Construction Company. Rafael R. Gonzalez was vice president until December 15, 1949, when he was succeeded by John Moore Robinson, Shaw's attorney, who served through 1958. The Shaws and the respective vice presidents during their tenure were the sole directors of the company since its organization.

Shaw Construction Company was a licensed general contractor in the State of California and was engaged in the business of general contracting and constructing single-family residences. In 1950 Shaw Construction Company started entering into contracts with other corporations for the building of single-family residences on various tracts. The houses were constructed to be sold, and were sold, to qualified veterans, the "takeout" loans being guaranteed by the Veterans' Administration at the time of the close of the sale escrow. The company constructed 502 houses during its fiscal year ending March 31, 1952, and 1,221 houses during its fiscal year ending March 31, 1953. These houses were constructed on 13 tracts of land, the record title to which was held by 1 or more of 88 corporations,[3] 3 trusts, 1 partnership, and the Shaws as individuals.

Of the 88 multiple corporations, 17 bore the name Tyree, the maiden name of Martha Shaw (A & R Tyree, Inc., B & R Tyree, Inc., etc.) ; 16 bore the name Leigh, the middle name of Harold Shaw (C & S Leigh, Inc., D & S Leigh, Inc., etc.) ; 5 bore the name Shell (A & C Shell, Inc., B & C Shell, Inc., etc.) ; 40 bore the name of consecutive [4] Spanish numerals; and the remaining 10 bore the various names following: White and Goodere Construction Co., Shaw Land Co., J. D. Development Co., M. J. Development Company, Leigh Investment Co., Tyree Investment Co., Caleasco, Inc., Passmore Development Co., Houser-Whitney Company, Inc., and Firestone Water Co. Of the 33 Tyree and Leigh corporations, 28 were organized on June 5, 1950, and the other 5, on either November 20 or December 14 of the same year; all 5 Shell corporations were organized on June 8, 1951; and 27 of the 40 Spanish corporations, on December 19, 1951, with the remaining 13, on January 11, 1952. The 10 odd-named corporations

---

[3] These 88 corporations will be referred to herein as the "multiple corporations" or the "multiples," and these terms may also include the three Robinson trusts, the partnership known as Rental Development, Ltd., and the Shaws individually.

[4] Once, Inc., through Cuarenta Uno, Inc., except for Ocho, Inc., which name was not used.

were organized on various dates between January 29, 1949, and August 28, 1950, except for Caleasco, Inc., Passmore Development Co., and Houser-Whitney Company, Inc., which were organized on September 23, 1937, May 28, 1948, and in 1927, respectively. All 78 of the Tyree, Leigh, Shell, and Spanish corporations issued 100 shares of $1-par-value stock. Harold L. and Martha J. Shaw were originally issued and owned 94 percent of the stock of the Tyree, Leigh, and Shell corporations, 79 percent of the 27 Spanish corporations organized in 1951, and 100 percent of the 13 Spanish corporations organized in 1952. With respect to the 10 odd-named corporations, the Shaws were originally issued and owned 94 of the 100 issued shares in each of Leigh Investment Co., Tyree Investment Co., and Firestone Water Co.; 194 of the 200 shares in each of J. D. Development Co. and M. J. Development Company; and 188 of the 200 shares of Shaw Land Co. The 2,000 shares of Houser-Whitney Company, Inc., were acquired by the Shaws and 16 Tyree corporations from the then owners thereof on or about July 9, 1950, the Shaws acquiring 185 shares and each of the Tyree corporations 110 shares except 1 which acquired 165 shares. The 100 shares of White and Goodere Construction Co. were held 50 each by Eric Hoffman, an employee of Shaw Construction Company, and J. M. Robinson. The 20 issued shares of Caleasco, Inc., and 100 shares of Passmore Development Co. were divided among members, or trusts involving members, of the Robinson family.[5] Harold L. Shaw, Martha J. Shaw, and J. M. Robinson served as president, secretary-treasurer, and vice president, respectively, and were the sole directors of 85 of the 88 corporations; in the case of the other 3—White and Goodere Construction, Caleasco, and Passmore—J. M. Robinson and two other individuals served as officers and directors of each.

In addition to the 88 corporations, 3 Robinson trusts also participated in the record ownership of the tracts upon which Shaw Construction Company erected houses in the years here involved. Harold L. Shaw was a trustee of one trust and had a trustee's power of attorney with respect to the other two. All of the other trustees, the trustors, and the beneficiaries were members of the Robinson family.

Harold L. Shaw, engaged in the construction business in the Los Angeles City area since 1922 and in developing subdivisions or tracts since 1941, was the prime mover in the acquisition and development of the tracts here involved. Although details varied in each instance, a general pattern was followed with respect to the acquisition of

---

[5] Rental Development, Ltd., a partnership comprised of several employees of Shaw Construction Company also participated in one of these tracts, but was recognized as a separate taxable entity by respondent and is not before the Court.

land, the construction of houses, and the ultimate sale of the improved lots.[6]

Shaw would locate the land and thoroughly investigate its suitability for development. He would contact the owners of the land, negotiate its purchase, and make arrangements for the financing of the purchase. The purchase transactions involved either cash or a note to the seller secured by a deed of trust subordinated to the construction loan, or a combination of the two. Most commonly the sellers took little or no cash and received a note secured by a deed of trust which, under the terms of an escrow agreement, was paid off from the proceeds from the sale of the completed houses. When cash was involved it was in most cases advanced by Shaw and/or Shaw Construction Company.

Legal title to the tracts would be taken in the name of Shaw individually (with his wife), Shaw Construction Company, or the recently organized corporate entities. Shaw would determine which entities would be involved and the number of lots in each tract that they would receive.[7] Tracts to which Shaw or Shaw Construction Company would initially take title were in almost all cases subsequently divided up and transferred to the multiple corporations or trusts at cost prior to the commencement of construction or sale to the ultimate purchaser. When the entities received legal title to land whose initial acquisition had involved cash supplied by Shaw or Shaw Construction Company, the cash amount was treated by the parties as an "advance" and carried on the books of Shaw or Shaw Construction Company as an open account receivable and by the corporation receiving the property as an account payable. Occasionally unsecured notes were given. These notes and accounts were usually settled when the completed houses were sold, but some remained outstanding for as long as 6 or 7 years. Interest was not paid on these advances.

All of the lots and houses were to be sold to veterans, and in order to qualify for Veterans' Administration insurance on the ultimate "takeout" loans, it was necessary to obtain a VA master certificate of "reasonable value" for each tract to be developed. This certificate established the maximum loan the Veterans' Administration would insure and the maximum selling price that each lot and house could be sold for to a qualified veteran. All houses in all tracts were ulti-

---

[6] A list of the entities involved in each tract and some of the details with respect to each is attached hereto as Appendix A which is incorporated herein by reference. A detailed chronology of all transactions relating to each tract is included in the stipulation of facts which is also incorporated herein by this reference.

[7] For example, in Tract 16696 title to lots 1–16 were taken in the name of G & S Leigh, Inc., lots 17–32 in M & S Leigh, Inc., etc. Shaw testified that the number of lots allocated to each multiple was determined by dividing the cost of construction of the house to be built on a lot into $100,000, the claimed maximum borrowing capacity of any one corporation.

mately sold at the maximum selling prices. VA required the filing of complete plans and specifications of the proposed development, showing the layout, construction materials, and location of the houses. Shaw or Shaw Construction Company prepared and filed these plans with VA. The certificates were issued by VA either in the name of Harold L. Shaw or in the name of Shaw Construction Company and were the sole property of the company. Thereafter, any deviations in construction from the approved plans had to be passed upon by the VA. In addition, a duty was imposed upon Shaw Construction Company to repair any defects in construction and to provide maintenance for a period of 1 year after sale to the veteran. The certificates of reasonable value were always obtained prior to and as a prerequisite to obtaining construction loans from savings and loan associations. Occasionally Shaw would make "dummy" applications for a certificate during his investigation of the property and prior to its acquisition in order to ascertain VA's appraisal and its willingness to insure loans on the particular property.

Approval for the development of the tracts was also required by the Regional Planning Commission and the Division of Real Estate of the State of California. This was obtained upon application made by either Shaw or Shaw Construction Company.

Having received the necessary governmental approval, Shaw, acting individually or for Shaw Construction Company, either personally or through a broker, arranged for the procurement of interim construction loans from savings and loan associations. With respect to the tracts involved herein, all of the construction loans were placed with one of two Los Angeles associations. Southern Federal Savings and Loan Association made 113 loans totaling $10,109,500 and Metropolitan Federal Savings and Loan Association made 31 loans totaling $2,878,500. These loans were placed in the names of the various entities holding title to the land for which the construction funds were designated and generally did not exceed $100,000 to any one entity. The various multiple corporations signed the notes and deeds of trusts.

The lending institutions negotiated the loans with Shaw, considered the projects as "Shaw tracts," requested and received Shaw's personal financial statement, which indicated a net worth in excess of $600,000, and required that he, in addition to the various corporations, be personally liable for the loan obligations.[8] Shaw or Shaw Construction Company guaranteed to the lenders the completion of all houses in accordance with the filed plans and specifications and that all labor and material used in the performance of the construction contracts would be paid for.

[8] Evidence with respect to the requirement that Shaw be personally liable on the construction loans is meager, but this is indicated by Exhibit 300 at least with respect to loans on one tract.

At the same time each loan was consummated with the appropriate corporate owner, the proceeds of the loans were immediately assigned to Shaw Construction Company, the general contractor, for its disbursement. The funds were to be disbursed only as construction progressed, and as labor and material had been incorporated in the houses upon which the loan was made, and after the work had been checked by the lender. All except one-seventh of the interest on all of the construction loans was paid for by Shaw Construction Company and deducted by it on its income tax returns.

Shortly after, or sometimes before, the various corporations took title to groups of lots in the tracts, they all executed substantially identical construction contracts with Shaw Construction Company. Under the contracts Shaw Construction Company was to construct one house on each lot according to the approved plans and specifications, and was to receive with respect to each completed house a sum fixed by the contract. Payments for construction were to come from the proceeds of the construction loan, which was to be made available in its entirety to the contractor.

Construction on the tracts was carried out on a "streamlined" basis, i.e., the various specialized mechanics would proceed up and down the streets performing their particular functions on a tract basis, without regard to the particular corporate owner of the lots or the contract covering the work. After the land was cleared, foundation men would install foundations, men would follow to install subflooring, after which raisers raised the plate line, stackers cut the roof, and so on through the successive stages of construction. This method of construction was economical and necessary to meet the sales price limitation imposed by the Veterans' Administration.[9] Shaw Construction Company owned much of the equipment required for construction, including trucks, skill saws, routers, generators, and other pieces. The corporate titleholders of the tracts owned no equipment.

Prior to obtaining the interim construction loans it was necessary to provide the lending institutions with mechanic's lien insurance and title insurance policies. This insurance was also required by the Veterans' Administration at the time of sale of the completed houses. In issuing the title policies and mechanic's lien insurance the title company, Title Insurance and Trust Company, required the multiple corporate landowner and Shaw Construction Company to execute an indemnity agreement wherein the title company was held harmless in the event of any losses sustained by the filing of mechanics' liens. In addition, the title company insisted upon and received a further and supplementary indemnity agreement from Harold L. and Martha J. Shaw personally. The amount of the contingent liability under

---

[9] Shaw testified that it would be impractical to operate on this basis with less than 50 houses involved.

these agreements would be equal to the full amount of the construction loan on each tract.

The completed houses were ultimately sold by independent real estate brokers, who usually were employed and provided "selling tract offices" on the properties by Shaw Construction Company, and the payment of their commissions was usually authorized by Shaw Construction Company. With respect to the sales effort, the houses were advertised as "Shaw Planned," "Shaw Built," and "An Outstanding new Shaw-Built Community." No reference was made to the various corporate record owners of the properties. At the time a sale was closed the proceeds were applied through an escrow to pay the outstanding amount due the original owner of the land, the construction loan, any outstanding balance due Shaw Construction Company under the construction contract, and selling commissions and miscellaneous expenses, and the balance was paid to the selling corporation.

The multiple corporations were organized with a capital of $100 each and they had no other assets except those received in these transactions. During the period involved herein the offices of the multiple corporations were the same offices rented and occupied by Shaw Construction Company and they had no independent telephone number or listing. The multiple corporations had no employees and no payroll. Their books and records were maintained by employees of Shaw Construction Company. All rent and other administrative expenses were paid for by Shaw Construction Company. With respect to two tracts, however, Shaw Construction Company in its construction contracts with the multiple corporations involved included in its contract price per house $100 for overhead.

During the 2 fiscal years ending March 31, 1952 and 1953, 1,723 houses were constructed by Shaw Construction Company for the multiple corporations, trusts, and individual titleholders, who in turn completed the sale of 1,638 houses to veteran purchasers.

In addition to and prior to the ultimate sales to veterans, a number of sale transactions were executed within the related group of entities. With respect to Tract 15681, title to the 134 lots was originally taken in the names of four of the multiple corporations and Harold L. (and Martha J.) Shaw as an individual, the latter receiving 67, or one-half of the lots. On December 29, 1952, immediately prior to the end of Shaw's taxable year in which he had sustained a $90,000 loss from other business ventures, he sold his interest in the lots and almost-completed houses to the four multiple corporations who owned the other half of the tract for $716,900, an amount almost equal to the maximum selling price fixed by the Veterans' Administration. The transaction resulted in a reported net profit of $62,158.37 to Shaw and ultimately no gain or a net loss to the corporate purchasers. The

latter were limited on resale to veterans to the VA price and sustained such selling expenses as sales commissions and loan fees.

The 74 lots of Tract 15896 were originally divided 12 or 13 lots each among six of the multiple corporations. On October 23, 1951, several weeks prior to the close of its taxable year, one of the titleholders, D & S Leigh, Inc., conveyed its 12 lots with partially completed houses to the Susan Linda Robinson Trust, one of the three trusts involved herein and with respect to which Shaw was trustee or attorney in fact. The transaction guaranteed D & S Leigh a profit of $11,500, and the trust suffered a loss upon ultimate resale of the lots to veterans.

Sales or transfers between the entities involved herein while construction was in progress, and prior to ultimate sale to veterans, also took place with respect to lots in Tracts 16472, 16608, 17672, and 17040–I.

On its income tax returns for its 2 fiscal years here involved, ending March 31, 1952 and 1953, Shaw Construction Company reported gross income of approximately $3,998,000 and $10,967,000, respectively, and net income of $22,655.72 and $19,988.39, respectively. The net income reported was equivalent to an average of approximately $25 per house constructed.

The fiscal years of the multiple corporations varied and in most cases did not coincide with that of Shaw Construction Company. During the years involved, however, none of the multiple corporations reported a net income of $25,000 or more in any one year. The total net income reported by the 88 multiple corporations and other entities involved in these tracts during the same period was equivalent to an average of approximately $1,350 per house sold.[10]

The multiple corporations continued in existence after the years here involved and none of them declared any dividends during these years.

In attributing to Shaw Construction Company the income reported by the 88 corporations, 3 trusts, and the Shaws individually, respondent eliminated the amounts paid by the multiples to Shaw Construction Company under the construction contracts and reallocated to Shaw Construction Company the income reported by the multiples and the deductions attributable thereto found to have been received or incurred by the multiples between April 1, 1951, and March 31, 1953, irrespective of the varying fiscal years of the multiples.

In connection with the interim construction loans made by the two savings and loan companies and arranged by Shaw, the president of Southern Federal Savings and Loan Association wrote a letter to

---

[10] The income reported by the multiple corporations included some income reported as from other than the sale of houses, such as interest, insurance premiums refunded, and capital gain, but it totaled less than 1 percent of the gross income reported and appears to have been derived from or related to the real estate and transactions here involved and profits received therefrom.

Harold L. and Martha J. Shaw dated July 21, 1950, advising that as a condition to making construction loans to them on the 191 homes on Tract 13788 the properties should be divided among and transferred to at least six corporations after the deeds of trust securing the loans made to the Shaws had been recorded, provided the six corporations assumed and agreed to pay the obligations under the deeds of trust, and provided the Shaws personally remained fully liable for all said obligations. By letter dated December 18, 1951, Southern Federal Savings and Loan Association wrote to Shaw Construction Company limiting the amount it would loan to any one borrower for construction of houses on "Tract 16493 [*sic*]" to $100,000. By letter dated March 13, 1951, the president of Metropolitan Federal Savings and Loan Association wrote to Harold L. Shaw advising that his company desired to limit the amount of construction loans it would make on Tract 16472 to any one borrower and suggesting that in the future it would be preferable to his company if the ownership of lots in the tract be divided among various borrowers. These letters were written at the request of Shaw and/or his attorney. The idea of limiting the amounts of loans to any one borrower was conceived by Shaw or his attorney and not by the lending institutions. The lending institutions were willing to lend the entire amounts actually loaned in lump sum to Shaw and Shaw Construction Company.

The multiple corporations in which the Shaws owned from 79 to 100 percent of the stock were shams, existing in name only, serving no business purpose and in reality performing no business or other functions.

OPINION.

The principal issue presented in these proceedings arises out of the use of multiple corporations in the acquisition, development, and sale of 13 separate tracts of land in the Los Angeles area for residential purposes.

Respondent determined that the entire net income from the development and sale of these properties is attributable to and taxable to Shaw Construction Company under the provisions of section 22(a)[11] because the multiple corporations were shams, there was no real independent business purpose in the creation and utilization of them, and the income derived from the development and sale of these properties was earned by Shaw Construction Company and is prop-

---

[11] SEC. 22(a). GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

erly taxable to it; or, even if the multiples are recognized as taxable entities, their gross income and deductions are nevertheless allocable to Shaw Construction Company under section 45 [12] in order to prevent evasion of taxes and to properly reflect the incomes of the various corporations. Respondent determined in the alternative that if the net income is taxable to the multiple corporations, only one surtax exemption and excess profits credit should be allowed for all the corporations (one eighty-eighth to each) under the provisions of sections 15(c), 45, or 129. Petitioners, on the other hand, argue that the multiples earned the profits reported by them and that none of the sections relied on by respondent permit taxing these profits to Shaw Construction Company or denying each corporation its own full surtax exemption and excess profits credit.

We have outlined the history and ownership of the corporations involved and the pattern followed in the development and sale of this real estate in our Findings of Fact and will not repeat those facts here.

We had the same arguments before us, under somewhat similar circumstances, in *Aldon Homes, Inc.*, 33 T.C. 582 (1959). In that case we found that the multiple corporations, lacking any substantial business purpose for organization and not having engaged independently in substantive business activities, were shams and not business entities worthy of recognition for tax purposes, and that under section 22(a) their net incomes were attributable to Aldon Homes, Inc., which directly or through its controlling stockholders took all the major steps necessary to create the income and controlled its disposition. We think respondent's position on this issue is even stronger under the circumstances of this case because here Shaw Construction Company, to which the income is sought to be taxed, actually built the homes and performed all of the activities which gave rise to the income, while, in the *Aldon* case, Aldon Homes, Inc., did not do the construction work in its own name and on the surface was relatively inactive during the period involved.

As we recognized in the *Aldon* case, taxpayers have the right to mold their business transactions in such a manner as to minimize the incidence of taxation, *Gregory* v. *Helvering*, 293 U.S. 465 (1935), *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950), but, on the other hand, the Government is not required to acquiesce

---

[12] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances, between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

**1114**

in the form chosen by taxpayers for doing business, and if the form is unreal or a sham, the fiction may be disregarded for purposes of the tax statutes. *Higgins* v. *Smith*, 308 U.S. 473 (1940). The incidence of taxation depends on the substance of the transaction, *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), and, as pointed out by Judge Learned Hand in *National Investors Corporation* v. *Hoey*, 144 F. 2d 466, 468 (C.A. 2, 1944) (reversing 52 F. Supp. 556) :

to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term "corporation" will be interpreted to mean a corporation which does some "business" in the ordinary meaning; and that escaping taxation is not "business" in the ordinary meaning.

To be afforded recognition for tax purposes a taxpayer "must be a viable business entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity," *Aldon Homes, Inc., supra. Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943).

Based on a consideration of all the evidence and observation of various witnesses on the witness stand, we have concluded that the multiple corporations organized by Shaw were not organized for any substantial business purpose but were organized primarily to obtain tax benefits, that they did not perform the business activities which created the income from the development and sale of this real estate, nor any substantial business activity that created income, and consequently did not earn the income in question, that those corporations, though legal in form, were unreal and shams and are to be disregarded for tax purposes, and that, with certain exceptions hereinafter noted, Shaw Construction Company earned the income from these real estate projects and is taxable thereon under section 22(a).

In order to show a business purpose for the creation and utilization of the multiple corporations, petitioners rely principally on the claim that the lending institutions which furnished the construction funds refused to lend more than $100,000 to any one corporate borrower and suggested that Shaw divide the properties among separate corporations in such a manner that none of them would require a loan of more than $100,000. In support of this claim petitioners rely primarily on the testimony of their only witness, Harold L. Shaw, and letters written by both of the lending institutions to Shaw suggesting a desire to limit the amount of the construction loans to any one borrower. The dates and contents of these letters are set out in our Findings of Fact. Royce H. Heath, the president of Southern Federal Savings and Loan Association, was called as a witness by respondent and testified that the idea of limiting the amount of loans to any one borrower originated, as far as he knew, with petitioners' attorney who had drafted the letter and had it delivered to him with

the request that it be written on the lender's stationery and sent to Shaw. Shaw denied this but it was also supported by the testimony of the loan broker who had delivered the form of letters from petitioners' attorney to both Heath and R. A. Martin, the president of Metropolitan Federal Savings and Loan Association. Furthermore, Heath testified that he was dealing with Shaw and would have been willing to make the original loan as one lump sum to Shaw Construction Company and saw no reason why it would be beneficial to the lender to split the loans among the multiple corporations.

Martin is deceased but at the time of trial the loan broker testified that she delivered the form letter to Martin who refused to agree to it at first. The only letter from Martin introduced in evidence was dated March 13, 1951, and referred to Tract 16472 upon which it is stipulated loans were made by Metropolitan on or about August 23, 1950, and which date appears to be several weeks after the last loan made by Metropolitan on any of the properties here involved. Also, the supervisory agent of the Federal Home Loan Bank Board testified that he saw no advantage to the savings and loan associations in splitting these loans and that the Board would have frowned on this practice had it come to their attention.

It is our conclusion from all the evidence on this point that the scheme to split the loans among a number of corporations originated with Shaw or his attorney and was used to justify the use of multiple corporations in these transactions rather than because of any sound business reasons except the tax benefits resulting therefrom.

Petitioners also argue that a business purpose for the use of numerous corporations was to facilitate the handling of mechanics' liens. Petitioners claim that under California law if an entire tract had been owned by one corporation a mechanic's lien for work done on the last house to be constructed would attach as of the date work was done on the first house in the tract, thus giving it a priority over any mortgage recorded after the first work was done but before any work was done on the last house. Respondent disputes this interpretation of the California law. But whichever interpretation of the law is correct, we are not convinced that this was a primary reason motivating the use of multiple corporations. This same argument was made and rejected in *Aldon Homes, Inc.*, *supra*. Other so-called business reasons for the use of multiple corporations advanced by petitioners were also considered and dealt with in our Opinion in *Aldon Homes, Inc.*, *supra*, and will not be discussed here. The preponderance of the evidence points to the fact that the tax benefits to be derived therefrom motivated the use of multiple corporations in these transactions and that no sound business purpose was served thereby.

Petitioners also argue that the multiple corporations rather than Shaw Construction Company earned the income and it therefore can-

not be attributed to Shaw Construction Company. We find little evidence of any value to support this contention but find ample evidence that the activities of Shaw Construction Company produced the income. The multiple corporations had no separate offices, had no employees, had no assets that would produce income, and originally had only $100 in capital. The officers of all of these corporations were the same, being Harold L. Shaw, president, Martha J. Shaw, secretary-treasurer, and John Moore Robinson, vice president. Shaw, or other employees of Shaw Construction Company, located the tracts for development and made arrangements to acquire them, made arrangements for construction loans, and obtained the approval and commitments of the Veterans' Administration. Shaw Construction Company built the houses, owned the equipment used, employed the construction and office workers, and paid the office overhead expenses. Shaw Construction Company had the reputation for building good homes and all lots were advertised and sold as Shaw-built homes with no mention ever being made to the purchaser of the multiple corporations until the deed was signed. The properties were sold by independent real estate agents and the multiple corporations had nothing to do with selling their lots. The only evidence of any activities on the part of the multiples are minutes of directors and stockholders meetings, wherein Shaw acting on behalf of the multiple corporations agreed to enter into a contract submitted by Shaw acting in behalf of Shaw Construction Company for construction of houses at a fixed price, or for the purchase of lots from Shaw, etc., and the signing of papers by Shaw in behalf of the multiple corporations in connection with loans and the final sale of completed lots. The multiples performed no services or functions which would produce income. And it is obvious that the only capital the multiples could use to produce income was the meager original capital put up for the most part by Shaw and funds borrowed on the strength of Shaw's guarantee and the construction know-how of Shaw Construction Company.

Petitioners point to a number of factual differences in the method of operation of Aldon Homes and the method of operation involved here in an effort to distinguish this case from the *Aldon* case. Principal among these are the claimed limitation on borrowing, which we have already dealt with, and the fact that in *Aldon*, Aldon Homes, Inc., controlled the distribution of income and profits through the use of callable bonds and notes. However, it is also clear here that Shaw Construction Company, through its officers and stockholders, had absolute control of the division and distribution of all income and profits received by Shaw, Shaw Construction Company, and the Shaw-controlled multiples from the development and sale of these properties. Shaw had no investor group to divide profits

with as was present in the *Aldon* situation, so he had no need for notes and bonds. The Shaws owned most of the stock in all of the corporations and could do as they pleased with any of them after the construction loans and the former owners were paid off. Shaw could fix the construction contract price between the multiples and Shaw Construction Company to divide the profits in any way he wanted. It seems to be more than coincidence that the majority of the profit went to the multiple corporations whose total income could be limited by the number of lots they owned and that none of them reported a net income of over $25,000, while Shaw Construction Company which built the houses and undertook all the construction risks earned an average profit of only $25 on each of the houses constructed. This of course permitted its net income to remain below the surtax brackets.

Petitioners also contend that the multiples earned a large part of the income through appreciation in the value of the land while they held it. They point to the fact that the certificate of reasonable value issued by the Veterans' Administration placed a value on the lots considerably in excess of the average price paid therefor. But the fact that a lot which will have a house on it is appraised at a figure higher than the cost of the unimproved lot does not mean that the value of the lot has increased to that extent by mere natural increase in value of building lots. This is rather obvious when it is observed that in most instances these Veterans' Administration appraisals were issued within a few weeks after the property was acquired by the multiple corporations, and in at least one instance, with regard to Tract 16944, were issued prior to the time the multiple corporations actually bought the lots at a lower price. If there was any increment in value of the lots, it was due to the planned development and construction work to be done by Shaw Construction Company.

We find nothing in the evidence or other arguments advanced by petitioners that convinces us there was any real business purpose or necessity for the organization and utilization of the multiple corporations or that they actually conducted any business activity which gave rise to the income from the development and sale of these properties. The evidence is clear that the multiple corporations were mere paper corporations that existed in form only for the purpose of obtaining the tax benefits available by splitting the income realized on these projects. We think this income was earned by Shaw Construction Company and is properly taxable to it under section 22(a). *Aldon Homes, Inc., supra.* See also *James Realty Company* v. *United States*, 176 F. Supp. 306 (D. Minn. 1959), involving the disallowance of surtax exemptions and excess profits credits to multiple corporations used in real estate developments under section 129, wherein the court appropriately observed (p. 311) : "the evidence shows that

the income from ownership of the developmental property was arbitrarily fragmentized into corporate units conveniently accruing just under $25,000 per year. * * *," and *Boyce* v. *United States*, 190 F. Supp. 950 (W.D. La. 1961), involving the use of 90 trusts with a single beneficiary wherein the court held that substance must prevail over form, that in truth there was only 1 trust, and it must bear the tax consequences flowing from the facts.

Petitioners point out that some of the income reported by the multiple corporations was from rentals and other sources not directly connected with the sale of this real estate. We have outlined the sources and amount of this income in footnote 10, and, in our opinion, it was so related to the development and sale of this real estate and the activities and funds supplied by Shaw Construction Company that it too was attributable to that company.

Respondent has recognized the partnership of some of Shaw's employees, Rental Development, Ltd., which participated in one of these tracts, as a separate taxable entity and has made no attempt to tax its income to Shaw Construction Company. Respondent has, however, determined that Shaw Construction Company is taxable on the profit made by the Shaws individually on the sale of 67 houses and lots on Tract 15681. These lots were owned by the Shaws and were sold on December 29, 1952, to the four multiples which owned the other 67 lots in this tract about the time construction of the houses was completed for a profit of $62,158.37, the sale price being about equal to the price for which the multiples sold these same houses and lots to veterans prior to March 31, 1953. Shaw offset this profit against a $90,000 loss from another source on his tax return for 1952. From the circumstances it is rather obvious that the transaction was consummated at this time and in this manner in order to give Shaw income in 1952 to offset his loss and that it was his complete control of the multiples which permitted him to accomplish it. However, this alone does not justify taxing this income to Shaw Construction Company and respondent has pointed to little else to justify it. The reasons for allocating the income of the multiples to Shaw Construction Company do not apply here. Shaw was a taxable entity and not a sham. Shaw individually performed a large amount of the activities which produced this income, and there is no way to tell whether his activities with respect to this property were in behalf of Shaw Construction Company or himself, or both. Construction of the houses was complete, or practically so, and there is nothing to indicate that the sale price to the multiples was out of line. There is ample evidence to support a conclusion that Shaw earned this income himself and respondent was not justified in allocating this income to Shaw Construction Company under either section 22(a) or section 45 just because Shaw took advantage of his control of the four multi-

ples to convert his profit into 1952 income rather than income in 1953. We hold that this income is not taxable to Shaw Construction Company.

Respondent has also allocated to Shaw Construction Company the income reported by Passmore Development Co. and Caleasco, Inc., two corporations in which neither Shaw nor Shaw Construction Company had any stock interest, and the income reported by the three Robinson trusts, in which Shaw had no beneficial interest. While it does appear that these entities were used in the general scheme of these development projects in much the same manner the Shaw-controlled corporations were used, they were all separate entities which, in the final analysis, could not be controlled by Shaw either as to their business activities, their tenure of existence, or the distribution of their income, and Shaw did not contribute their capital. The trusts were created by persons independent of Shaw. The two corporations were organized in 1937 and 1948 and at least served the purpose of funneling the income from the one tract in which they participated into the hands of entities unrelated to Shaw and over which he had no control. We assume that the officers and directors of these two companies acted in behalf of their companies and independently of Shaw in entering into the transactions which produced their income. It is farfetched to believe that Shaw would let this income go beyond his reach if he really considered it income of Shaw Construction Company. We find no tax evasion motives so far as Shaw or Shaw Construction Company are concerned in taxing this income to Caleasco and Passmore. The income did not belong to Shaw Construction Company and could not be controlled by its stockholders. We hold that the income reported by Passmore Development Co., Caleasco, Inc., and the three Robinson trusts was not taxable to Shaw Construction Company.[13]

Our conclusions above make unnecessary a discussion of whether the gross income and deductions of the corporations controlled by Shaw can be allocated to Shaw Construction Company under section 45. We believe our discussion above also disposes of any contention that the gross income and deductions of Caleasco, Inc., Passmore Development Co., the Robinson trusts, or the Shaws individually, may be allocated to Shaw Construction Company under section 45, and respondent's alternative contention regarding the surtax exemption and excess profits credits under sections 15(c), 129, and 45.

There remains the question whether respondent erred in disallowing the construction costs of Tracts 17040–I and 3660 in the fiscal

[13] It would appear from the evidence before us that none of the stock of White and Goodere Construction Co. was owned by the Shaws or Shaw Construction Company. However, petitioners do not argue that this corporation was not controlled by Shaw. In the absence of evidence to the contrary, respondent's allocation of the net income of this corporation to Shaw Construction Company must stand.

years ending March 31, 1952 and 1953, respectively, when spent and claimed, and allowing them in the following years when the houses were sold.

Seventy-eight houses were constructed on Tract 17040–I in the fiscal year ending March 31, 1952, and all except 18 of them were sold in the fiscal year ending March 31, 1953. Thirty-one of the 116 houses constructed on Tract 3660 during the fiscal year ending March 31, 1953, were sold during that fiscal year and the balance were sold in the following fiscal year. Petitioners claimed the cost of construction of these houses as deductions for the years in which they were constructed. Respondent disallowed these costs for the years in which the houses were constructed but not sold, and determined that they were allowable as deductions for the years in which the houses were sold. It is stipulated that M. J. Development Company sold its 10 houses and lots in Tract 17040–I to one of the Robinson trusts and that J. D. Development Co. sold its 8 houses and lots in this tract to another Robinson trust on October 23, 1951. Respondent ignored this sale and treated all 78 lots as having been sold after March 31, 1952, apparently on the theory that a sale to the trusts was not a true sale. Since we recognize the Robinson trusts as separate and unrelated taxable entities, these two sales on October 23, 1951, will be recognized as having occurred on that date.

Respondent's theory is that whether the unsold houses are considered ending inventory or whether the cost of construction is considered as a cost of goods sold, the construction costs may not be taken into account until the houses are sold in order to properly reflect income, citing sections 22(c) and 43 in support thereof. Petitioners take the position that Shaw Construction Company was building these houses for unrelated parties under contract and that its costs are deductible not later than the date of completion of the contracts.

The record owners of all the lots in these two tracts at the time the houses were built thereon were all one of the multiple corporations in which Shaw owned at least 94 percent of the capital stock. Since we have concluded that all of these multiple corporations were shams and that all their income and deductions are attributable to Shaw Construction Company, it follows that the construction contracts between Shaw Construction Company and the multiples would be ignored in deciding this question. Therefore in order to properly reflect the income of Shaw Construction Company as in effect the owner and builder of these properties, it would, in our opinion, be necessary to defer taking these construction costs into account until the properties were sold by the multiples.

Section 41 provides that net income shall be computed upon the basis of the taxpayer's annual accounting period in accordance with the method of accounting regularly employed in keeping the books of

the taxpayer, but if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of respondent does clearly reflect the income. Section 43 provides that deductions and credits shall be taken for the taxable year in which paid or accrued (or incurred) "unless in order to clearly reflect the income the deductions or credits should be taken as of a different period." Shaw Construction Company did not report the sale of any houses on its returns for the years here involved and the record does not show how it reported the sale of any houses it built and sold. The respondent has determined that in order to properly reflect the net income from the construction and sale of these houses and lots the cost of construction of the houses should be treated as inventory or a part of cost of goods sold and not taken into account until the houses and lots were sold. Petitioners suggest no method that would more properly reflect net income if Shaw Construction Company is to be treated as owner-builder-seller for tax purposes. Respondent's determination on this question must therefore stand and the cost of constructing each house will be deductible in the fiscal year of Shaw Construction Company in which the particular house was sold by the multiple corporation.

Petitioners complain of several large errors in respondent's computations in the notice of deficiency. Some of these errors have been corrected by a supplemental stipulation filed by the parties after the original briefs were due. There may be other errors that a careful analysis of the maze of transactions here involved and the reallocation of income and deductions will reveal. However, such errors in mathematics and computations would not change our conclusions on the basic issues involved and we are confident that the parties can work out between themselves the correct net income of the petitioners computed in accordance with our conclusions herein. Any unresolved disputes as to specific items can be decided at a hearing under Rule 50.

*Decisions will be entered under Rule 50.*

## APPENDIX A.

### SUMMARY TABULATION OF TRACTS OF LAND INVOLVED HEREIN

| Tract No. | Acquisition | | Land cost | Building loans (number) | Construction contract price per house (date of contract) | Number of lots | Houses completed and sold to veterans 4/1/51–3/31/53 |
|---|---|---|---|---|---|---|---|
| | Initially (date) | Transferred prior to construction to— (date) | | | | | |
| 16472 | 16 Tyree (A-H, K-O, R-T) Sebe, Inc. (7/9/50) | (1) | $123,163.97 | $1,650,000 (16) | $7,750_____ (9/4/50) | 287 | 287 |
| 16696 | 3 Leigh (G, J, M)_____ Shaw Land Co. (12/14/50) | (1) | 65,256.03 | 409,500 (4) | $7,750_____ (1/8/51) | 63 | 63 |
| 15896 | 3 Leigh (C, D, E)_____ Tyree Investment Co. Leigh Investment Co. Firestone Water Co. (1/17/51) | (1) | 96,200.00 | 481,000 (6) | $7,700_____ (3/6/51) | 74 | 74 |
| 16608 | 4 Leigh (F, H, K, J)__ Sebe, Inc. (1/16/51) | (1) | 40,000.00 | 338,000 (5) | $8,100_____ (2/14/51) | 52 | 52 |
| 3660 | 12 Spanish (Treinta through Cuarenta Uno) (1/21/52) | (1) | 154,556.00 | 986,000 (12) | $8,695_____ (1/21/52) | 116 | 31 |
| 15681 | 3 Leigh (S, T, W)_____ Leigh Investment Co. H. Shaw (4/3/52) | (1) | 134,000.00 | 1,005,000 (6) | $8,700_____ (3/13/52) | 134 | 134 |
| 16944 | Shaw Construction Co. (6/6/51) | 16 Tyree (A-T). 3 Leigh (D, G, M). Tyree Investment Co. White-Goodere Constr. Co. J. D. Development Co. M. J. Development Co. Houser-Whitney Co. (8/22 and 10/31/51) | 214,400.00 | 2,150,000 (24) | $8,900 plus $100 overhead. (7/27/51) | 2 255 | 253 |
| 16943 | Shaw Construction Co. (7/30/51) | 27 Spanish (Uno through Viente Ocho— No "Ocho") (12/26/51) | 220,800.00 | 2,252,500 (27) | Cost plus $100 overhead. (12/20/51) | 266 | 264 |
| 17040-II | H. Shaw_____ (11/29/51) | 5 Shell (A-E) 9 Leigh (C-F, H, K, L, N, O, R) 1 Tyree (W) 2 Spanish (Viente Nueve; Treinta) Shaw Land Co. Firestone Water Co. (1/21/52) | 94,732.00 | 1,487,500 (19) | $8,650_____ (3/4/52) | 167 | 167 |
| 17040-I | 6 Leigh (N, O, R, S, T, W) M. J. Development Co. J. D. Development Co. (3/20/51) | (1) | 35,549.60 | 575,000 (8) | $8,500_____ (5/17/51) | 78 | 78 |

See footnotes at end of table.

| Tract No. | Acquisition | | Land cost | Building loans (number) | Construction contract price per house (date of contract) | Number of lots | Houses completed and sold to veterans 4/1/51–3/31/53 |
|---|---|---|---|---|---|---|---|
| | Initially (date) | Transferred prior to construction to— (date) | | | | | |
| 17672 | Passmore Development Co. (2/26/52) | 2 Tyree (A, B) S. E. Knott Trust S. L. Robinson Trust J. M. Robinson IV Trust Rental Development, Ltd. Caleasco. Inc. Passmore Development Co. (4/11/52) | $68,145.00 | (4) | $8,500 8.700 (1/3/52) | 98 | 4 98 |
| 16492 | H. Shaw (5/31/51) | 5 Shell (A-E) (7/27/51) | 79,350.00 | $517,500 (5) | $7,600 (7/18/51) | 69 | 69 |
| 16362 | H. Shaw (11/5/51) | J. M. Robinson IV Trust S. L. Robinson Trust | 38,400.00 | (3) | $9,900 (12/28/51) | 68 | 68 |
| 18149 | H. Shaw (3/31/52) | (3) | 65,120.00 (5) | 1,136,000 (12) | (3) | 142 | (3) |
| 14266 | 9 Spanish (Treinta Uno through Treinta Nueve). | (1) | | | | | |