John G. Masoni and Helen Masoni v. Commissioner. Joseph C. Lombardo and Mary Lombardo v. Commissioner. Estate of W. Frank Hobbs, deceased, Sara Keller Hobbs, Executrix and Sara K. Hobbs v. Commissioner.
Masoni v. Commissioner
Docket Nos. 3021-65 - 3023-65.
United States Tax Court
T.C. Memo 1968-129; 1968 Tax Ct. Memo LEXIS 169; 27 T.C.M. (CCH) 619; T.C.M. (RIA) 68129; June 26, 1968, Filed *169 Held, that during the taxable years 1960 and 1961 a race track was operated by a partnership, rather than by a corporation which had theretofore operated the track but which had subleased the premises to the partnership during the years in question, and that therefore each partner is entitled to deduct his proportionate share of the losses sustained by the partnership in the operation of the track. Richard Katcher, 1100 Keith Bldg., Cleveland, Ohio, for the petitioners. George J. Tomlinson, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax against the petitioners John G. Masoni and Helen Masoni for the taxable years 1960 and 1961 in the respective amounts of $23,659.11 and $21,901.00, against the petitioners W. Frank Hobbs and Sara K. Hobbs for the taxable years 1960 and 1961 in the respective amounts of $30,389.51 and $22,242.96, and against the petitioners Joseph C. Lombardo and Mary Lombardo for the taxable years 1960 and 1961 in the respective amounts of $18,443.22 and $23,067.87. Hereinafter John G. Masoni, W. Frank Hobbs, and Joseph C. Lombardo will be referred to collectively *170 as the petitioners. The issue presented is whether it should be considered that a partnership, Jeff Downs Company, operated Jefferson Downs Race Track during the taxable years 1960 and 1961, with the result that the petitioners, as partners thereof, are entitled to deduct their shares of the operating losses sustained in the operation of the track. Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. At the time of filing the petitions Lombardo resided in Parkview, Ohio, Hobbs resided in Tampa, Florida, and Masoni resided in Fort Lauderdale, Florida. Masoni and Lombardo each filed joint income tax returns with their wives for the calendar years 1960 and 1961 with the district director of internal revenue at Cleveland, Ohio. Hobbs filed a joint income tax return for the calendar years 1960 and 1961 with the district director at Tampa, Florida. All three petitioners employed the cash receipts and disbursements method of accounting. Prior to 1959 a corporation known as Magnolia Park, Inc., had unsuccessfully operated a horse race track in Jefferson Parish, Louisiana (such course having been known as Magnolia *171 Park Race Course and later as Jefferson Downs Thoroughbred Race Track) upon land leased to it by Malcolm Woldenberg and Stephen Goldring. Magnolia Park, Inc., was, at all times herein material, in reorganization pursuant to Chapter X of the Bankruptcy Act, the trustee being Richard B. Montgomery, Jr. In August 1958, the trustee obtained from the Louisiana State Racing Commission a license to conduct a race meeting at the track for the spring season of 1959. On November 1, 1958, Woldenberg and Goldring leased the property to the trustee, under an agreement entitled "Net Ground Lease," for a term of 30 years and 2 months, the lease being recorded in the records of Jefferson Parish. It provided for an annual rental of $50,000 for the first year, $55,000 for the second year, and $60,000 for each year thereafter, plus a percentage of the gross pari-mutuel receipts and a percentage of certain other revenues. It was provided that any existing or subsequent improvements should be the property of the lessee. Therein it was recognized that it was the intention of the trustee to enter into a sublease with a corporation to be known as Jefferson Downs, Inc. On November 3, 1958, Jefferson Downs, *172 Inc., hereinafter referred to as the corporation, was organized under the laws of Louisiana. The trustee of Magnolia Park, Inc., entered into an "Operating Agreement and Lease" with the corporation whereby he subleased the above property to the corporation, it being specifically provided that the improvements were not leased to the corporation. The sublease was for a term of 2 years and 2 months, commencing November 1, 1958, with an option to the lessee to renew 620 the lease for an additional term of 28 years. The corporation agreed to conduct horse racing on the premises for at least 60 days (apparently each year). The rental was stated as a percentage of the pari-mutuel receipts of the track (with a $60,000 minimum), plus 15 percent of any receipts from the use of the premises other than as a race track. It was provided that any improvements should belong to the trustee. This lease was recorded in the records of Jefferson Parish. In November 1958 the racing commission, at the request of the trustee, approved the corporation's application to be the operator of the track under the above license which had been granted to the trustee for the 1959 spring racing season. Prior to *173 the opening of the 1959 spring racing season the track was renovated by the corporation, which erected several new barns, made additions to the clubhouse and grandstand, erected a paddock in front of the clubhouse, and installed new lighting. The 1959 spring racing season began on March 2 and ended on May 2. The meeting was hampered by stormy, damp, and cool weather. Due in part to the bad weather, the corporation incurred a loss of $320,304.41 for the 8 months ended July 31, 1959. The balance sheet as of July 31, 1959, showed an excess of liabilities over assets of $124,220.13. In the summer of 1959, Masoni inspected the race track facilities and also the financial reports of the corporation and of Magnolia Park, Inc., to determine the advisability of purchasing on behalf of himself and others a controlling stock interest in the corporation. His examination of the financial records disclosed the loss sustained at the spring meeting. His examination of the race track facilities led him to believe it would be necessary to make substantial improvement to make the track usable. Sometime in August 1959 Masoni, acting on behalf of himself, New Orleans Sportservice, Inc. (hereinafter *174 referred to as Sportservice), Lombardo, and Hobbs (all four parties being referred to hereinafter collectively as the Masoni group), [1] purchased from the then stockholders of the corporation slightly over 80 percent of the 17,331 outstanding shares of the corporation's stock, all of the corporation's outstanding debentures (face value of $139,950) and all of the loans payable to stockholders (face value of $170,370.36). The purchase price of the stock was $8.01 per share, and that of the debentures and loans was face value. After the purchase the shares of stock of the corporation were owned *175 as follows: No. of Shares
Masoni
3,480
Hobbs
3,480
Lombardo
3,480
Sportservice
3,480
C. Ray Edmonds
1,554
Others
1,857 Thereafter the following persons were elected as officers and directors of the corporation: Edmonds
President and Director
Hobbs
Vice-president and Director
N. Ford Reese
Secretary and Director
Masoni
Treasurer
The members of the Masoni group were experienced operators of race tracks. In spite of the losses which had been sustained by the corporation during the 1959 spring race meeting, the Masoni group believed that they could provide better management than the corporation had theretofore had and that they could operate the track at a profit, if further improvements were made to the physical facilities. Their belief was based, in part, upon the fact that in June 1959 the state law had been amended to reduce the percentage of pari-mutuel wagering pools which the operator of a race meeting was required to pay as license fees. It was the intention of the Masoni group to continue oprating the track through the corporation. On August 13, 1959, the corporation applied to the state racing commission for a license to *176 conduct race meetings in the fall of 1959 and the spring of 1960, such meetings to be for the periods September 24, 1959 through November 21, 1959, and March 11, 1960, through April 23, 1960, respectively. The license was granted in August 1959. In preparation for the 1959 fall race meeting, the corporation, under management of the Masoni group, improved the race track facilities, at a cost of about $50,000, by installing heating equipment in the clubhouse 621 and grandstand, paving the parking area, resurfacing the race course, installing underground drainage facilities, and building additional barn facilities. In the fall of 1959 the members of the Masoni group made loans to the corporation in amounts and on dates as follows: Masoni
$ 17,654.49
10/ 1/59
Lombardo
17,654.49
10/ 1/59
Hobbs
17,654.49
10/ 1/59
Sportservice
300.000.00
9/30/59
17,654.49
10/ 1/59
15,000.00
11/30/59 The other shareholders of the corporation did not make any loans to it. L & M Properties Company, an Ohio corporation, loaned $45,000 to the corporation on November 30, 1959. [2]
*177 Operation of the 1959 fall race meeting resulted in a loss of $263,091.33 to the corporation, which was attributable in part to unusually inclement weather. The balance sheet of the corporation as of November 30, 1959, showed an excess of liabilities over assets of $410,085.74. As a result of the losses totaling over $500,000 which the corporation had suffered in operating the track during the 1959 spring and fall race meetings, the Masoni group gave consideration, in early 1960, to the question whether the operation of the track should be continued. Sportservice indicated to Masoni that it believed its loan to the corporation, which was in excess of $300,000, was in jeopardy and that it was considering demanding payment, and inquired what the other stockholders intended to do about the situation. The Masoni group was not willing to loan more money to the corporation since the minority stockholders had not loaned money to it. A meeting of the stockholders of the corporation was held late in January 1960 at which Masoni reviewed the financial situation of the corporation and its need for immediate funds. He referred to the outstanding loan payable to Sportservice and further pointed *178 out that the balance sheet indicated that the corporation was insolvent. He suggested at the meeting a plan for the operation of the track during the 1960 spring meeting. He proposed that a partnership to be known as "Jeff Downs Company" be organized to operate the track. Under the plan the partnership would sublease from the corporation the property which the latter had subleased from the trustee of Magnolia Park, Inc. Masoni stated that if the plan were adopted Sportservice would not demand immediate payment of the amount due it from the corporation. He suggested that all the stockholders of the corporation be afforded the opportunity of becoming members of such partnership. The plan was adopted. The president of the corporation was authorized to negotiate on behalf of the corporation a sublease and operating agreement with the partnership to be formed, and Reese, the secretary and attorney for the corporation, was authorized to do whatever was necessary to obtain the approval of the trustee in bankruptcy to the sublease and operating agreement, as well as the approval of the bankruptcy court if, in his opinion, it was necessary. On March 1, 1960, Masoni, Lombardo, Hobbs, Sportservice, *179 and the corporation entered into an agreement forming a partnership known as "Jeff Downs Company" (hereinafter referred to as the "partnership"), for the stated purpose, among others, of operating race tracks. The partnership agreement was not recorded in the "Index to Partnerships and Trade Names" of Jefferson Parish. The corporation was included as a partner because it had already been granted a license to operate the 1960 spring race meeting at Jefferson Downs and the Masoni group believed that the only way the partnership could operate such meeting was to have the corporation as a partner, since the license was not transferable. In the agreement Masoni was designated as the manager of the partnership. It was provided in the agreement that the interest of each partner should be in proportion to his initial contribution to its capital. Each member of the Masoni group made an initial contribution to the capital of the partnership of $19,200 and the corporation made a contribution of $3,200. The agreement provided that the minority stockholders of the corporation might become partners, if, among other things, they would make loans to the corporation in proportion to the loans which *180 the members of the Masoni group had theretofore made to the corporation. None of such minority group became a member of the partnership. At the January 1960 meeting of the stockholders of the corporation it had been 622 resolved that the corporation issue to any stockholder who became a member of the partnership on or before March 1, 1960, an option to purchase, at 10 cents per share, a proportion of the authorized but unissued stock of the corporation (about 82,000 shares) equal to the proportion of the outstanding stock which he already owned. [3]
On March 1, 1960, the corporation and the partnership entered into an agreement entitled "Sublease and Operating Agreement," by the terms of which the former subleased to the latter the premises which it had previously subleased from the trustee, it being stated that it was the intention of the parties that the partnership should operate the leased premises *181 as a race track. Such document was not recorded in the public records of Jefferson Parish. The initial term of the agreement was for a period of 10 months, commencing March 1, 1960. In addition, the agreement provided that if the corporation should exercise its option to extend the term of its sublease, then the partnership should, in turn, have the option to renew its agreement with the corporation for 28 successive annual periods beginning January 1, 1961, conditioned upon the partnership's giving written notice to the corporation on or before November 1 of the year preceding the year for which the option was to be exercised. The amount which, under the agreement, was to be paid by the partnership to the corporation was the same as that which the corporation was required to pay tot the trustee as rent, plus, however, a sum equal to one-half of the net profits of the partnership, before taxes, from operation of the leased premises. In the agreement the corporation agreed that, as part of the consideration for the agreement, it would pay to the partnership onehalf of the net income, before taxes, realized by it pursuant to its concession agreement with Sportservice. It was provided *182 that the partnership should pay all taxes except taxes upon real estate or improvements and that it should maintain fire and windstorm insurance and public liability insurance, the policies to name as insureds the owners of the leased premises, the trustee, and the corporation as their respective interest might appear. Shortly after the execution of the above "Sublease and Operating Agreement," Reese advised the trustee of the existence thereof. Prior to the formation of the partnership Masoni had been a member of other partnerships and was aware of the unlimited liability of partners. He also knew that for income tax purposes each partner takes into account his share of the partnership's profit or loss. Lombardo and Hobbs had also been members of other partnerships. The accounting work for the corporation had been done by an accounting firm with which Brandon Woolley and Jack Vigo were associated. Masoni advised Woolley and Vigo that the partnership would operate the race track during the 1960 spring meeting and directed them to set up an accounting system to reflect the operation by the partnership. He furnished them with copies of the partnership agreement and the agreement *183 between the corporation and the partnership. Masoni also advised the corporation's part-time bookkeeper, Edward Fulham, that the partnership would operate the track, and directed him to keep such records as Vigo should direct to reflect such operation. At Vigo's direction Fulham, as of March 1, 1960, set up a separate set of books for the partnership, consisting of a general ledger and cash receipts and disbursements journals. Vigo instructed Fulham and an office employee of the corporation who handled some of the bookkeeping to keep the books in such a manner as to segregate the operations of the corporation from those of the partnership. Bank accounts were set up for the partnership under the name of "Jeff Downs Co." The capital contributions totaling $80,000 made by the partners were deposited in such accounts. On March 30, 1960, the corporation applied for, and was granted, a license to conduct the 1960 fall race meeting to run from October 4 through November 19, and 1961 spring race meeting to run from March 7 through May 6. Commencing March 1, 1960, the receipts from the operation of the race track, consisting of mutuel receipts, concession receipts, and other miscellaneous *184 receipts, were deposited daily in the partnership's bank accounts and were recorded in its 623 books of account. Expenditures incurred in the operation of the track, including legal and accounting charges, were paid by checks drawn on the partnership's bank accounts and were recorded in its books of account. The corporation continued to maintain books of account, consisting of cash receipts and disbursements journals, a general ledger, and other subsidiary account records, such as payroll accounts and bank accounts. Expenditures made by the corporation were paid from its bank accounts and were recorded in its books of account. Every six months the accounting firm reviewed the records of the partnership. Any expenditures which should have been made by the corporation but had been improperly made by the partnership, or vice versa, were corrected on the records of both the partnership and the corporation and proper reimbursements were made. At the time the partnership was formed the corporation had in existence a payroll account, a payroll bank account, and preprinted payroll checks. It had employer identification numbers for purposes of both Federal and state taxes. After March 1, 1960, the *185 same employees, with normal replacements, continued in the operation of the track. For convenience it was decided to have the corporation continue to file Federal and state withholding tax returns under its identification numbers, but all such taxes were paid directly from the partnership's bank accounts. The race track bookkeepers computed the total net pay due the race track employees for each pay period and a partnership check was drawn payable to the corporation in that amount. Such check was then deposited in the corporation's payroll bank account and checks were issued to the various employees against that account. The corporation also filed Federal admissions tax returns, but that tax, as well as the state admissions tax, was paid by checks drawn on the partnership's bank accounts. The Louisiana pari-mutuel tax was paid by checks drawn on the partnership's bank accounts. The rent due the corporation under the sublease and operating agreement between the partnership and the corporation was paid directly to the trustee by checks drawn on the partnership's bank accounts. The 1960 spring race meeting was held from March 11 to April 30, 1960. The financial statement of the partnership *186 reflected a loss over the period from March 1, 1960 to May 30, 1960, in the amount of $74,511.33. [4]
*187 The financial statement of the partnership reflected a loss over the period June 1, 1960 to December 31, 1960, which included the fall race meeting, in the amount of $118,681.05. The partnership books, as of December 31, 1960, reflected loans payable to Masoni in the amount of $30,000, to Lombardo in the amount of $10,000, and to L & M Properties, Daytona Beach Kennel Club and Cloverleaf Drive-In Theatres, Inc., in the total amount of $75,000. [5]
In its Federal income tax return for the taxable year 1960 the partnership reported a net loss of $190,374.84. Therein it reported as income all the receipts from the operation of the race meetings, as well as one-half of the concession income. It deducted all the expenses *188 of operating the race meetings. Included in its deductions was about $300,000 as compensation to employees. In its Federal income tax return for its taxable year ended November 30, 1960, the corporation reported a net loss of $39,799.93. 624 The income which it reported consisted entirely of rental income and one-half of the concession income. Its principal deductions consisted of interest and depreciation. The corporation exercised its option to renew its sublease with the trustee for a term of 28 years, commencing January 1, 1961. By letter dated December 30, 1960, Masoni, acting on behalf of the partnership, notified the corporation that the partnership was exercising its option to extend the term of its sublease and operating agreement with the corporation for an additional year to December 31, 1961. The financial statement of the partnership for the period January 1, 1961 through May 31, 1961, which included the spring race meeting, reflected a loss of $81,500.33, and such statement for the period June 1, 1961 to December 31, 1961, which included the fall race meeting, reflected a loss of $112,515.39. The partnership books as of the end of the year showed no indebtedness *189 owing to Masoni, Lombardo, L & M Properties, Daytona Beach Kennel Club or Cloverleaf Drive-In Theatres, Inc. Its records indicate that during 1961 the partnership had borrowed from and repaid to the above three companies a total amount of approximately $167,000. In its Federal income tax return for the calendar year 1961 the partnership reported a net loss of $192,469.03. In its Federal income tax return for the taxable year ended November 30, 1961, the corporation reported a net loss of $15,170.05. By letter dated December 27, 1961, Masoni, acting on behalf of the partnership, notified the corporation that the partnership was exercising its option to extend the term of its sublease and operating agreement with the corporation for an additional year to December 31, 1962. The financial statement of the partnership for the period January 1, 1962 through May 31, 1962, which included the 1962 spring race meeting, reflected a profit of $54,347.70, and for the period June 1, 1962 through December 31, 1962, which included the fall race meeting, reflected a loss of $25,931.32. Its records show loans payable at the end of the year 1962 to Masoni in the amount of $50,000 and to L & M Properties *190 in the amount of $20,000. Its records indicate that during the year 1962 the partnership had borrowed from and repaid to L & M Properties and Daytona Beach Kennel Club a total amount of $165,000. In its income tax return for the calendar year 1962, the partnership reported a profit of $28,882.64. In its income tax return for the taxable year ended November 30, 1962, the corporation reported a net loss of $59,774.49. Its balance sheet as of November 30, 1962, showed an excess of liabilities over assets of $506,171.50. On November 26, 1962, a special meeting of the stockholders of the corporation was held. The minutes of such meeting contain the following statement: Mr. Masoni then reported that as a major stockholder and as a partner of Jefferson Downs Company, he was informed that the partnership has lost a total of approximately $400,000 and when the lease between the partnership, Jefferson Downs Company and Jefferson Downs, Inc. came up for renewal, it was not going to be renewed by the partnership. In some measure this was brought about by the attitude and views taken by the Internal Revenue Service. By letter dated December 30, 1962, Masoni, on behalf of the partnership, *191 notified the corporation that the partnership would not exercise its option to extend the term of its sublease and operating agreement with the corporation for an additional year. The partnership continued in existence after December 31, 1962, but carried on no business except closing out its operation. Its return for 1963 showed an excess of expenses over income of about $1,960. Its return for 1964 showed no income and no deductions. As of December 31, 1964, the petitioners' capital accounts totaled $22,305.15. The corporation operated the race track for the remainder of its taxable year ended November 30, 1963, and throughout its taxable year ended November 30, 1964. Its income tax returns for those years showed net profits of $63,384.04 and $483,629.34, respectively, before any net operating loss deduction. The partners' capital accounts in the partnership for the years 1960 to 1962 reflected the following: 625
Partners
Masoni
Lombardo
Hobbs
Original Investment 3/1/60
$ 19,200.00
$ 19,200.00
$ 19,200.00
Additional Investments:
Dec. 31, 1960
9,800.00
9,800.00
9,800.00
Dec. 31, 1961
84,293.13
68,293.13
38,293.12
Dec. 31, 1962
5,000.00
5,000.00
5,000.00
Total Investments
$118,293.13
$102,293.13
$ 72,293.12
Less Withdrawals Dec. 31, 1962
6,749.39
6,749.39
6,749.39
Total Investment - Net
111,543.74
95,543.74
65,543.73
Less Operating (income) Losses:
Year Ended
Dec. 31, 1960
46,366.17
46,366.17
46,366.17
Dec. 31, 1961
46,563.77
46,563.77
46,563.77
Dec. 31, 1962
( 6,819.93)
( 6,819.93)
( 6,819.93)
Total Loss
86,110.01
86,110.01
86,110.01
Balance as of Dec. 31, 1962
$ 25,433.73
$ 9,433.73
[20,566.28)
*192 Partners
Sportservice
Corporation
Total
Original Investment 3/1/60
$ 19,200.00
$ 3,200.00
$ 80,000.00
Additional Investments:
Dec. 31, 1960
9,800.00
1,633.33
40,833.33
Dec. 31, 1961
84,293.12
14,048.86
289,221.36
Dec. 31, 1962
30,000.00
45,000.00
Total Investments
$143,293.12
$ 18,882.19
$455,054.69
Less Withdrawals Dec. 31, 1962
6,749.39
26,997.56
Total Investment - Net
136,543.73
18,882.19
428,057.13
Less Operating (income) Losses:
Year Ended
Dec. 31, 1960
46,366.17
7,727.70
193,192.38
Dec. 31, 1961
46,563.77
7,760.84
194,015.72
Dec. 31, 1962
( 6,819.93)
(1,136.66
( 28,416.38)
Total Loss
86,110.01
14,351.68
358,791.72
Balance as of Dec. 31, 1962
$ 50,433.72
$ 4,530.51
$ 69,265.41 During the period from March 1, 1960 through December 31, 1962, the partnership drew over 4,000 checks on its bank accounts for amounts totaling over $8,300,000. The designation on the face of these checks was either "Jeff Downs Company Operating Jefferson Downs, Inc." or "Jeff Downs Co. Operating Jefferson Downs", and the designation above the signature on such checks was either "Jeff Downs Company" or "Jeff Downs Co." The *193 designation on the face of checks issued by the corporation was either "Jefferson Downs, Inc." or "Jefferson Downs Operating Account", and the designation above the signature on such checks was either "Jefferson Downs, Inc.," "Jefferson Downs, Inc. Operating Account," "Jefferson Downs Operating Account," or "Payroll Account." During the years 1960, 1961, and 1962 the corporation, but not the partnership, was listed in the New Orleans telephone directory and the city directory. The daily racing programs contained the name of the corporation, but not the name of the partnership. With few exceptions, creditors furnishing goods and services to the race track during the years 1960, 1961, and 1962, and others dealing with the track, were not advised of the existence of the partnership. The creditors continued to render their bills for goods and services in the same manner as they did prior to the formation of the partnership. Masoni advised the secretary of the Horsemen's Benevolent Protective Association and the head of the employees' union of the existence of the partnership and that it was operating the race track. On March 20, 1961, Vigo and Edmonds advised the chairman of the *194 Louisiana State Racing Commission of the relationship between the corporation and the partnership and presented to him the books kept by each. Financial statements of both the corporation and the partnership were furnished to such commission in connection with all race meetings held from the fall of 1960 through the spring of 1963. By letter of April 26, 1961, Woolley notified the finance director of Jefferson Parish of the existence of the partnership and told him that the partnership had been operating the race meetings during 1960 and 1961. In his Federal income tax return for the taxable year 1960 Masoni, Lombardo and Hobbs each claimed a deduction of $45,689.96 as his share of the partnership's loss for that year. For 1961 each claimed a deduction of $46,192.57 as his share of the partnership's loss for that year. In the notices of deficiency the respondent disallowed the above losses claimed by each petitioner with the statement that "you are not entitled to a deduction, in the amount of * * * shown on your return as a loss from a partnership, Jeff Downs Company, New Orleans, Louisiana." The deficiencies were due principally to the disallowance of these claimed losses. *195 626 During the taxable years 1960 and 1961 the partnership, and not the corporation, operated the race track. Opinion The respondent, in support of his determination, contends that the partnership was not organized for a bona fide business purpose, but was merely a device utilized for tax avoidance; that in reality it was the corporation, and not the partnership, which operated the race track during the years in question; that the partnership was therefore a sham and should be disregarded for tax purposes; that the losses sustained in the operation of the track during the years 1960 and 1961 were those of the corporation and not of the partnership; and that therefore the petitioners are not entitled to take into account, as partners, the losses sustained in the business. He cites, among other cases, Higgins v. Smith, 308 U.S. 473; Gregory v. Helvering, 293 U.S. 465; and National Carbide Corp. v. Commissioner, 336 U.S. 422. The basis for the respondent's contention that the partnership was a tax avoidance device is the fact that when the petitioners, who were the principal stockholders of the corporation, decided in early 1960 to form *196 the partnership to operate the track, the corporation had been and was losing money in the operation of the track, that in 1960 and 1961 the operation of the track continued to result in large losses (about $193,000 in 1960 and about $194,000 in 1961), and that when the operation of the track resulted in a profit of about $29,000 in 1962 the petitioners decided not to continue the operation in partnership form but to then permit the corporation to operate. He argues that the petitioners anticipated that there would be losses for a time and that they formed the partnership in order that they as partners might deduct such losses, but that when it appeared in 1962 that the operation would thereafter result in profits they allowed the operation to revert to the corporation in order to avoid incurring individual tax liability on the expected profits. He points out that the arrangement between the partnership and the corporation was such that the petitioners could at the end of each year decide whether or not it was advantageous taxwise to continue the operation in partnership form. In support of his position that the partnership did not serve any valid business purpose he states that the *197 operation continued in the same manner with the same employees, and contends that there was no improvement of credit to the race track as a result of the formation of the partnership, and that changing the business form in no way affected the profits or losses incurred in the operation of the track. The petitioners contend that the partnership must be recognized for tax purposes since, they claim, the partnership did, in fact, carry on the business of operating the track. Their position is that the motive for the formation of a partnership is immaterial so long as it actually carries on business activity. They contend that in any event there was a valid business purpose for the formation of the partnership, namely, to obtain funds to carry on the operation of the track. As we have stated in prior cases, following Higgins v. Smith, supra, Gregory v. Helvering, supra, and other Supreme Court cases, it is axiomatic that a taxpayer may adopt such form for the conduct of his business as he may desire in order to minimize the incidence of taxation, so long as the form is not a sham and business is actually carried on. Thus, in Aldon Homes, Inc.33 T.C. 582, *198 we stated in part: The above cases make it clear that a taxpayer may adopt any form he desires for the conduct of his business and that form cannot be ignored merely because it results in a tax saving. However, to be afforded recognition the form the taxpayer chooses must be a viable business entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity. Moline Properties, Inc. v. Commissioner 319 U.S. 436; Jackson v. Commissioner, (C.A. 2, 1956) 233 F. 2d 289. Escaping taxation is not a substantive business activity. National Carbide Corp. v. Commissioner, 336 U.S. 422, footnote 20, citing National Investors Corp. v. Hoey, supra. That case involved only corporations, but the same rule is equally applicable where the form adopted is that of a partnership. Seminole Flavor Company, 4 T.C. 1215; Coca-Cola Bottling Co. of Sacramento, 17 T.C. 101; and Polak's Frutal Works, Inc. 21 T.C. 953. In the latter case we stated in part: Moreover, the motive of tax avoidance for entering into a transaction or adopting a 627 particular form *199 of business has never been held to be sufficient, in and of itself, as a basis for liability unless the transaction first establishes such liability without it. John Junker Spencer, 19 T.C. 727; see Chisholm v. Commissioner, 79 F. 2d 14 * * *. Thus, a taxpayer is free to choose the type of organization or form in which he will cast his business activities to achieve a desired business or tax result. John Junker Spencer, supra; Higgins v. Smith, 308 U.S. 473. He is not required to adopt or continue with that form of organization which results in the maximum tax upon business income. Meldrum & Fewsmith, Inc., 20 T.C. 790. Moline Properties, Inc. v. Commissioner, 319 U.S. 436. Furthermore, if a taxpayer actually carries on business in the form chosen, the tax collector may not deprive him of the incidental tax benefits flowing therefrom, unless it first be found to be but a fiction or a sham. John Junker Spencer, supra; Higgins v. Smith, supra; Rhode Island Hospital Trust Co., 7 T.C. 211. * * * We have given very careful consideration to the voluminous evidence presented *200 and conclude that the operation of the race track by the partnership was not a mere sham. While the saving of taxes may have played some part in the decision of the majority stockholders of the corporation to set up the partnership and conduct the operation through it, we are satisfied that tax avoidance was not the only purpose served by its conduct of the business. We think the testimony and other evidence establish that one of the reasons for the utilization of the partnership was to provide necessary capital to continue operation of the track. In any event, we think that the partnership did in fact actually carry on the operation of the track during the years in question, and was therefore a viable business entity, separate and apart from the corporation. In early 1960 the corporation was in bad financial condition, having lost large amounts of money on several race meetings. Its liabilities greatly exceeded its assets. When the Masoni group, which included the three petitioners and Sportservice, purchased the controlling interest in the corporation in 1959, the members of such group also purchased at face value the outstanding indebtedness of the corporation in the amount of *201 over $300,000. In addition, the Masoni group then made additional loans to the corporation, the petitioners each lending about $17,600, and Sportservice lending about $330,000. Thereafter the corporation continued to operate at a deficit and in early 1960 Sportservice was considering demanding payment of its loan. Operation of the track required further capital, but none of the members of the Masoni group was willing to lend any more money to the corporation since the minority stockholders had not loaned any money. Masoni testified that he was unwilling to lend more money to the corporation because it was insolvent and he would have no assurance that the loan would be repaid, but that he was willing to lend money for the operation of the track if the track were operated by a partnership since he would then have the security of the unlimited liability of the other individual partners. He also stated that if the necessary funds could have been obtained by the corporation, the corporation would have continued to operate the track. He further stated that it was a question of either operating in the partnership form or not operating at all. Upon the formation of the partnership each member *202 of the Masoni group made a contribution to its capital of about $19,000 and the corporation made a contribution to its capital of about $3,000. The corporation was made a partner since it held the license to operate the track. Thereafter, throughout the three years that the partnership operated, the members of the partnership made further net contributions to the capital of the partnership of over $348,000. Furthermore, throughout such period the petitioners, Masoni and Lombardo, made loans to the partnership of $90,000 and certain corporations in which Masoni and Lombardo owned about a two-thirds controlling interest made loans to the partnership totaling $427,000. Thus, during the years in question the operation of the track was financed with new capital. These new funds were placed in bank accounts in the name of the partnership, and all expenses, including salaries of the employees, were paid therefrom. Although the corporation continued to issue pay checks to the employees, this was done as a matter of convenience. The amount of the salaries for each pay period was paid to the corporation in advance out of the partnership's bank accounts. It is also true that the corporation *203 continued to file Federal and state withholding tax returns, but the taxes were always paid directly by the partnership. The partnership kept complete and adequate records reflecting its 628 operations separate and apart from those of the corporation. The respondent does not raise any question as to the amount of rental provided in the sublease to the partnership. He does point out that the sublease and the operating agreement between the corporation and the partnership were on a year-to-year basis, thereby allowing the petitioners to elect each year whether to continue the sublease and the operation, whereas the corporation was committed to a 28-year lease. He also refers to the fact that neither the partnership agreement nor the sublease and operating agreement was recorded in the records of Jefferson Parish and the fact that most of the creditors who furnished goods and services to the race track and others dealing with the track were not advised of the existence of the partnership. He therefore contends that the partnership was intended to exist only as a "bookkeeping entry." However, as pointed out above, the partnership did actually operate the track during the years in *204 question and was therefore not a mere sham. The failure to record a partnership agreement is not determinative of the status of the partnership for Federal income tax purposes. The question whether a purported partnership is to be recognized for Federal tax purposes depends upon whether the parties in good faith and acting with a business purpose intended to join together in the conduct of an enterprise. Commissioner v. Culbertson, 337 U.S. 733. [6] We art satisfied that the petitioners and the other partners did intend to form the partnership for the purpose of operating the race track. The partners here involved were unrelated. Masoni and Lombardo and corporations in which they owned the controlling interest (but in which there was also a substantial minority interest) loaned very large amounts of money to the partnership. It is reasonable to conclude that Masoni, Lombardo and such corporations, in making such loans, relied upon the existence of the partnership and the consequent personal liability of the other partners. *205 In view of all the foregoing, it is our conclusion that during the taxable years 1960 and 1961 the losses resulting from the operation of the race track were those of the partnership, and not the corporation, and that the respondent erred in determining that the petitioners were not entitled to take into account their distributive shares of such partnership losses. Decisions will be entered under Rule 50. Footnotes
1. There was no family relationship among the members of the Masoni group. None of the petitioners was related to the family which owned or controlled Sportservice. Sportservice was in the business of furnishing personnel and supplies to the operation of concession stands at race tracks, ball parks, etc. Masoni had been associated with Lombardo in various business enterprises for about 30 years. He had also been associated with Hobbs for a number of years in business enterprises. Masoni and Lombardo had had previous business relations with Sportservice at various times and various places.↩
2. Two-thirds of the outstanding stock of L & M Properties Company was owned by Masoni and Lombardo and their wives.↩
3. Each member of the Masoni group purchased 16,600 shares of stock of the corporation with the result that as of June 16, 1960 the corporation's common stock was owned as follows: Masoni 20,080, Hobbs 20,080, Lombardo 20,080, Sportservice 20,080, Edmonds 1,554, and others 1,857.↩
4. In a memorandum prepared by Woolley dated April 29, 1969, it was stated in part: In a one hour conference with me today, John G. Masoni, managing partner of Jeff Downs Company, brought out these points: * * * (5) We are to prepare as of May 31, 1960 uncertified financial statements which will show operations on one sheet separately for Jeff Downs Company, for Jefferson Downs, Inc. and combined for the six months from December 1, 1959 to May 31, 1960. The balance sheet probably should separate the assets and liabilities in the same manner. Mr. Masoni said that the financial statements were primarily intended for the use of management and owners and was [sic] not expected to be circulated to the Louistana Racing Commission or to other outside parties. (6) I asked Mr. Masoni whether or not it would be necessary for the partnership to continue now that it was obvious that the operation was beginning to get on a solid footing. He said it was absolutely necessary to have a partnership for the spring meeting to get financing for it because no one would put up money for a bankrupt corporation which is and was the condition of Jefferson Downs, Inc. He said however, that the partnership would probably continue at least through the fall meet and would very likely continue its operations to about November 30, 1960.↩
5. Masoni and Lombardo and their wives owned approximately two-thirds of the stock of L & M Properties Co. and Cloverleaf Drive-In Theatres, Inc., and Masoni and Lombardo owned about 70 percent of the stock of Daytona Beach Kennel Club. In view of the personal liability of all the partners, Masoni was willing to make a loan to the partnership which he would not have made to the corporation; he, Hobbs, and Lombardo each had a net worth in excess of $1,000,000.↩
6. In the Culberston case, the Supreme Court stated in part: The question is * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purpose for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *↩